613 So.2d 646 (1993)
Edmond O. HINES, Plaintiff-Appellee,
v.
ARKANSAS LOUISIANA GAS COMPANY, et al., Defendants-Appellants.
No. 24051-CA.
Court of Appeal of Louisiana, Second Circuit.
January 20, 1993.
Rehearing Denied February 18, 1993.
Writ Denied May 14, 1993.
*648 McGlinchey, Stafford, Cellini & Lang by Donna Galchus, Little Rock, AR, Blanchard, Walker, O'Quin & Roberts by Lawrence W. Pettiette, Jr., Shreveport, for defendants-appellants.
Walter F. Clawson, Shreveport, for plaintiff-appellee.
Before SEXTON, LINDSAY and HIGHTOWER, JJ.
HIGHTOWER, Judge.
Defendants, Arkansas Louisiana Gas Company ("Arkla") and eight of its employees, appeal judgment in favor of plaintiff, Ed Hines, in this defamation and invasion of privacy action. For the reasons hereinafter expressed, we reverse.

FACTS
Beginning in late 1985 or early 1986, Arkla conducted a company-wide attitude survey designed to determine how conditions could be improved for its employees. As a first step, individual workers completed questionnaires. Later in feedback sessions, work groups met to discuss the complaints and needs of their particular offices, as disclosed by the study, and to propose solutions to their supervisors.
At that time, plaintiff supervised nine dispatchers and clerks at the Dalzell Street facility, one of Arkla's corporate locations in Shreveport. The individual defendants, Patti DeBroeck, Vicki Cyrus, Sandra Wade, Steve Cude, Steve Cooley, Cleveland Cyrus, John DeWitt, and Charles McFerrin, all worked in the dispatch office. Hines would subsequently maintain that each of these employees resented his implemented work changes as well as certain disciplinary measures. However, during the attitude survey and feedback sessions, their complaints centered upon his use of abusive and indecent language.
In an effort to resolve that problem, leaders of the office work force met with Hines. As a result of either an agreement to establish a "cursing kitty" or his promise to improve on other items, the employees excluded the entire section of the feedback document dealing with abusive language. Nonetheless, through some oversight, both the original and corrected versions of the report arrived at the Human Resources Department, which had initiated the original survey.
Thereafter, partially prompted by the deletion, Diedra Owens, an associate human resources representative, scheduled a broad discussion of employment issues with the members of the dispatch group. Meanwhile, in an earlier meeting with personnel from another department, a service technician also suggested that she speak to the dispatch employees. That individual, Billy Kline, who had been only temporarily assigned to the office in early 1986, stated that a problem existed concerning Hines's use of abusive, "filthy" language and his treatment of the female employees. Kline further told Owens that he would not want his wife treated in such a manner.
Later, when Owens actually met with the employees in question, they expressed similar concerns about intolerable language and unacceptable conduct within their office. She then relayed these reports to the vice president of Human Resources, who instructed her and Jack Sanchez, the director of corporate compliance programs, to begin investigating the matter. At the outset, they conducted separate interviews with DeBroeck, Cyrus, and Wade, the female employees of the dispatch office. These three individuals related incidents in which Hines had rubbed their shoulders in a prurient manner, used profanity, and made improper sexual comments. Ms. Wade additionally complained that the supervisor had engaged in racial remarks, passed around explicit nude cartoons, and *649 "frequently turn[ed] innocent comments into something sexual." After each woman's statement had been reduced to writing, the interviewee involved read the document and affixed her signature.
The investigative team next reported their initial findings to Billy Nichols, vice president of operations for the Texas and Louisiana Division of Arkla. After first expressing disbelief that such conduct occurred at the Dalzell facility, Nichols asked that additional inquiries be conducted. During the pendency of the continuing investigation, however, management suspended Hines with pay on April 15, 1986. Subsequently, individual interviews with the male employees of the office corroborated the females' revelations. None of the statements recited precisely identical events, but a common theme emerged, disclosing that Hines engaged in obscene language, sexual remarks, and inappropriate touching of the women.
On April 18, 1986, Rodney Tabor, Hines's second-level superior, informed plaintiff of the allegations and the ongoing investigation. During their discussion, Tabor merely indicated that serious accusations concerning elements of sexual harassment had been leveled. Yet, even without disclosures concerning specifics of the statements or who had made them, plaintiff offered counters to many of the allegations. Among other denial efforts, he admitted rubbing the women's shoulders and asserted that this occurred without any sexual overtones. Also, none of his foul language in the office, he said, had been used to curse at any employee. Later that same evening, Hines called Tabor at home to rebut these allegations again.
After all eight employee statements had been prepared, Sanchez once more met with Nichols to discuss the disclosures. Due to the wealth of evidence, and despite Hines's denials conveyed through Tabor, the vice president concluded that the allegations were true. On April 24, 1986, subsequent to a meeting of executive management, Tabor presented plaintiff with two options. Hines would be allowed to resign voluntarily and collect all unemployment benefits, or, otherwise, he would be terminated and such benefits contested. After further protestations and denials, plaintiff chose resignation. Previously, he had planned to retire in six years, at age fifty-five.
Contending that the reasons for his termination, along with the employees' allegations, eventually became common knowledge within the company and community, Hines subsequently instituted suit against Arkla and the eight individual subordinates for defamation and invasion of privacy. Although the original petition also averred wrongful termination, a motion for summary judgment resulted in dismissal of that cause of action.[1]
At trial, the jury found both Arkla and the individual defendants to be liable for defamation. The verdict awarded $150,000 for past and future wages and $50,000 for general damages. Insofar as the claim for invasion of privacy, the jury found that the corporation, but not the individual defendants, invaded plaintiff's privacy by placing him in a false light before the public and unreasonably disclosing private embarrassing facts about him to the public. Again, the jury awarded $150,000 for past and future lost wages and $50,000 for general damages. Upon motion of defendants, the court struck the apparently duplicative lost wage award. Defendants now appeal, assigning several errors.

DISCUSSION
At the very first, we again carefully note the trial court's earlier summary judgment dismissing the wrongful discharge claim by plaintiff, an "at will" employee. See LSA-C.C. Art. 2747; Brannan v. Wyeth Laboratories, Inc., 526 So.2d 1101 (La.1988); Roberts v. Louisiana Bank & Trust Co., 550 So.2d 809 (La.App. 2d Cir. 1989), writ denied, 552 So.2d 398 (La.1989). Thus, the issues before us, and previously before the jury, concern only defamation and invasion of privacy.

*650 Polygraph Evidence & Standard of Review

Due to its substantial impact upon our review, we initially consider appellants' ninth assignment of error, the contention that the trial court improperly admitted testimony concerning plaintiff's request for a lie detector test.
The issue presented itself even during plaintiff's opening statement, prompting defense counsel to assert a sidebar objection which the judge termed a motion in limine. While agreeing that results of a polygraph examination would be inadmissible, the court ruled that plaintiff could present testimony concerning his offer to take the test. Although the willingness to submit to such an examination could not be utilized in reference to the truth of Hines's denial or even the reasonableness of the investigation, the court opined that nothing barred such evidence, albeit it possibly "a prejudicial subject," to show Hines's state of mind during the April 18 meeting with Tabor. But at no time, nor in any manner, did the court instruct the jury on the supposed limited use of this evidence.
Following the trial court's ruling, plaintiff questioned several witnesses on the disputed subject. Hines maintained that, at the meeting with Tabor, he volunteered to demonstrate his truthfulness by taking a lie detector test. Tabor, however, did not remember, nor did his written notes of the conversation disclose, such an offer. Understandably, then, Nichols did not recall ever learning of any such suggestion concerning a polygraph examination. Nonetheless, in his closing argument, plaintiff again directly referred to both Tabor's and his own testimony on the subject.
Clearly, the results of a polygraph examination are inadmissible in criminal trials. State v. Catanese, 368 So.2d 975 (La. 1979).[2] Furthermore, the exclusion of such evidence in civil cases has been consistently upheld on appeal. Rebouche v. Anderson, 505 So.2d 808 (La.App. 2d Cir. 1987), writ denied, 507 So.2d 228 (La. 1987); Associates Financial Corporation v. Carrick, 441 So.2d 1311 (La.App. 2d Cir.1983); Manale v. Department of Police, 376 So.2d 607 (La.App. 4th Cir.1979). Indeed, the federal fifth circuit has noted adherence to an unequivocal rule of exclusion, making no exception for civil cases, even in instances where the polygraph results are purportedly offered for a purpose other than asserting the truth of the statements contained therein. See Barrel of Fun, Inc. v. State Farm Fire & Casualty, 739 F.2d 1028, 1031 (5th Cir. 1984); Smith v. Gonzales, 670 F.2d 522, 528 (5th Cir.1982), cert. denied, 459 U.S. 1005, 103 S.Ct. 361, 74 L.Ed.2d 397 (1982). Nevertheless, in the case at hand, the challenged admissibility of a witness' willingness to take a lie detector test presents this court with a res nova issue.
Traditionally, courts have cited the dubious scientific reliability of polygraph tests as a reason for exclusion. Concerns arise with respect to the qualification and selection of experts to conduct the study and to inform a jury of the exact meaning of results. Indeed, lie detector tests only have a high degree of accuracy when conducted by well qualified examiners under proper conditions. See discussion in Catanese, supra. Yet, as stated in that case, the foremost reason for disallowing such evidence rests with its exaggerated, prejudicial effect upon the triers of fact. Accord, E. Cleary, McCormick's Handbook on the Law of Evidence, § 207 at 507 (2d Ed.1972). "[P]resent-day jurors, despite their sophistication and increased education levels and intellectual capabilities, are still likely to give significant, if not conclusive, weight" to such evidence. U.S. v. Alexander, 526 F.2d 161, 168 (8th Cir.1975).
Thus, recognizing the propensity of fact-finders to place heavy reliance on polygraph evidence, we are convinced that in most cases testimony concerning a party's willingness or refusal to submit to such procedures should be excluded.[3] Even evidence *651 of one's offer to take such a test invites an unfounded, prejudicial bolstering of credibility. It is highly probable that a juror, inclined to accept polygraph results as irrefutable, will assume that an individual agreeing to a lie detector test is not untruthful. In fact, in certain respects, the disclosure of such an overture may be more deleterious than the test results themselves. Any prejudicial assumptions remain undiminished by the few safeguards afforded by actual testing, e.g., qualified experts and pristine testing conditions. Here, for instance, evidence of Hines's alleged offer to undergo polygraph examination repeatedly came to the jury's attention during opening statements, testimony, and closing arguments, all without the slightest explanation of the significance of testing procedures.
The purported use of this evidence, Hines's offer to submit to a polygraph test, for the purpose of showing his state of mind during the meeting with Tabor, appears questionable at best. Simply put, we doubt the relevance of such evidence. But quite clearly, when the subject repeatedly came before the jury, and especially without any limiting instructions whatsoever, the pervasive effect in prejudice far outweighed any dubious probative value. Thus, under the balancing test provided by LSA-C.E. Art. 403, such evidence should have been excluded. Indeed, in allowing its introduction here, the trial court erred.
Ordinarily, of course, a jury's findings of fact are reviewed under the manifest error standard. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). However, where some consequential error such as the improper admission or exclusion of evidence interdicts the fact-finding process, the manifest error standard is no longer applicable, and the appellate court must make its own independent review of the record, giving no weight to the jury verdict and deciding the case by a preponderance of the evidence. McLean v. Hunter, 495 So.2d 1298 (La.1986); Pitard v. Stillwater Transfer & Storage, 589 So.2d 1127 (La. App. 4th Cir. 1991), writ denied, 594 So.2d 1314 (La.1992); Schwamb v. Delta Air Lines, Inc., 516 So.2d 452 (La.App. 1st Cir.1987), writ denied, 520 So.2d 750 (La. 1988); Brooks v. St. Tammany Parish School Board, 510 So.2d 51 (La.App. 1st Cir.1987), writ denied, 513 So.2d 821 (La. 1987). See also Buckbee v. United Gas Pipe Line Co., Inc., 561 So.2d 76 (La.1990); Jaffarzad v. Jones Truck Lines, Inc., 561 So.2d 144 (La.App. 3d Cir.1990), writ denied, 565 So.2d 450 (La.1990).
In the case at hand, considering the extreme prejudicial potential of the erroneously admitted testimony, we deem the jury's findings tainted. Granted, the jury may have rendered an identical verdict if the evidence in question had been excluded, but we are unable to state with any degree of certainty that the jury would have done so. To the contrary, the record affirmatively suggests that plaintiff's offer to take a lie detector test could well have been the pivotal factor in the decision concerning the liability of these defendants. See McLean, supra. Hence, we must make a de novo assessment of liability, without deference to the jury verdict, determining if plaintiff proved by a preponderance of the evidence his claims of defamation and invasion of privacy against the corporate and individual defendants.

Individual DefendantsDefamation
In their appeal, the individual defendants assert that the evidence fails to show they defamed Hines. We agree.
To maintain a case for defamation, the plaintiff bears the burden of proving the following elements: defamatory words; publication; falsity; malice (actual or implied); and resulting injury. Cangelosi v. Schwegmann Bros. Giant Super Markets, 390 So.2d 196 (La. 1980); Martin v. Lincoln General Hosp., 588 So.2d 1329 (La.App. 2d Cir.1991), writ denied, 592 So.2d 1302 (La. 1992); Roberts, supra. Upon a plaintiff's *652 failure to demonstrate even one of these elements, the cause of action fails. Roberts, supra.
At trial, all eight individual defendants testified, along with a number of other persons. Also, the handwritten investigative notes and resultant typed statements entered into evidence. Hines, of course, in an effort to prove falsity, presented several witnesses in addition to himself.
Sandra Wade testified that, commonly, as she sat at her desk in the dispatch office, Hines approached her from the rear and, after first putting his hands on her shoulders, would begin to rub. Had she not stopped his actions on these occasions, Wade believed, he would have continued the movement of his hands down the front of her body and onto her breasts. In response to these provocative advances, she elbowed Hines or told him to stop. She further stated that, in another form of offensive touching, he would poke her in the side. Plaintiff also frequently directed sexual and racial remarks toward her. Indeed, Hines's comments caused her to believe that he thought that all black women constantly stayed in bed, i.e., remained readily willing to engage in sexual relations. He often made remarks about Wade's "behind" and noted that she would be a "good piece." Typically on Monday mornings, the supervisor would ask her if she had "gotten any" over the weekend. If she appeared tired, he expressed the view that she had "gotten too much;" and, when he deemed her moody, she did not "get any." She further related how Hines would turn innocent comments into sexual remarks. Often she found his sexually explicit cartoons, drawings of nude couples, and off-color jokes to be offensive.
Another of the female employees of the dispatch office, Patti DeBroeck, offered similar complaints. Hines subjected her to the same shoulder rubbing and rib prodding maneuvers. She too felt that, unstopped on these occasions, plaintiff would have proceeded from massaging her front shoulder area to fondling her breasts. In addition to making verbal protestations, DeBroeck would slap the supervisor's hands or elbow him in the side. According to her testimony, she also witnessed Hines touching the other women in the same unwelcome manner. She further heard him coarsely commenting on Wade's "behind." Frequently, plaintiff would talk about sex in general and specifically comment on his desire to go to bed with DeBroeck. Indeed, in one incident, when the two had gone together on a company errand to a store, Hines propositioned her by displaying the key to a motel room, which he supposedly had procured for their use. When DeBroeck refused the offer, he complained that she had caused him to waste $40. As evidenced by her typed statement, and later reflected in DeBroeck's testimony, Hines insinuated that the women employees owed him sexual favors in return for any indulgences he extended at work.
Although DeBroeck mentioned her supervisor's use of abusive language (e.g., his saying "f you" when angered) during the feedback sessions, she avoided commenting on the sexual harassment incidents because she considered this topic too personal and embarrassing. In fact, in that her husband also worked at Arkla, she did not even mention these occurrences to him as she feared for both their jobs.
Vicki Cyrus, the receptionist in the dispatch office, likewise testified about Hines rubbing her shoulders, poking her in the side, and leaning over her at the desk. She too thought that plaintiff intended to fondle her breasts on several occasions; however, she successfully arrested these attempts. Nonetheless, her continued protestations did not thwart his activities altogether. Frequently, her supervisor asked embarrassing and improper questions or made offensive jokes about her sexual activities, especially with her new husband. When unable to be present at work due to illness, plaintiff would attribute Cyrus's absence to her menstrual cycle and then observe that she must not be pregnant.
Considering these matters generally to be very personal and embarrassing, Cyrus did not lodge such accusations during the attitude survey. Additionally, she felt that *653 Hines would likely retaliate against her for speaking out. In fact, fear of losing her employment precluded her disclosure of these episodes to even her husband, whom she thought apt to confront her supervisor.
The testimony of Steve Cooley, one of the dispatchers, further corroborated the reported inappropriate behavior. He stated that, on several occasions, he noticed Hines rubbing the shoulders of Sandra Wade and Vicki Cyrus and patting the latter's buttocks. Plaintiff would also prod the women in the side. Cooley specifically remembered hearing the supervisor telling Wade that she had a "fine butt" and that he would like to "get some of that." These activities accompanied Hines's use of obscenities and dirty jokes. Also, quite often, he cursed at the male employees. According to Cooley, his supervisor became upset over the attitude survey and feedback sessions, specifically stating his desire to accumulate enough information to have "Buddy" Cyrus, the supposed leader of the group meetings, fired.
Another dispatcher, Charles McFerrin, characterized his supervisor's language as rude, obscene, and hostile. On repeated occasions, to this witness and to Sandra Wade and Patti DeBroeck, Hines addressed remarks charged with sexual overtones and implications. In addition to rubbing the women's shoulders over their protests, plaintiff expressed his desire to "get together" with Wade. McFerrin specifically remembered two instances where Hines made crude remarks to him in the presence of both male and female co-workers. Once, after this employee returned from a trip to Dallas, plaintiff asked if he had "gotten laid" or contracted a venereal disease. When McFerrin experienced some form of tonsillitis on another occasion, Hines commented, "I know your problemyou have a cunt hair stuck in your throat." According to the witness, plaintiff designed his sexual jokes to embarrass, not amuse.
John DeWitt also testified to observing Hines with his hands on the females, rubbing their shoulders, and poking them in the sides. He perceived that the supervisor would have fondled the women's breasts if not stopped. Plaintiff further commented that the females should have intercourse with him as they would enjoy it. DeWitt said Hines treated all the employees "like dirt," particularly harassing Wade and referring to her as "just a G D nigger."
Cleveland "Buddy" Cyrus had not only observed Hines rubbing Vicki Cyrus's shoulders and thrusting Sandra Wade and Patti DeBroeck in the sides, but also remembered the women complaining about these actions. Further, within his hearing, the supervisor remarked that the women needed a "good screwing," and directed other obscene remarks toward them. Plaintiff would particularly comment about Wade's "behind" and state that he would "like to have some of it." The witness further recalled the previously mentioned statement that Hines made to McFerrin after the latter's trip to Dallas. Cleveland Cyrus had also been privy to a conversation in which the supervisor suggested that all the servicemen should "gangbang" Barbara Ayers, an employee in another department. In general, Hines frequently used foul language around the office.
Steve Cude, another of the individual defendants, testified that he too had witnessed Hines rubbing the women's shoulders and frequently making vulgar comments about their bodies, particularly that Vicki Cyrus had a "nice ass." None of these remarks seemed to be appreciated by the females, and Cude eventually found the conduct so unpleasant that he routinely closed his office door. This witness also asserted that plaintiff used profanity and cursed, even at the male employees.
Three other Arkla employees provided further corroboration. Rebecca Matthews, a construction dispatcher, related an incident that occurred while the service office shared space with her department. She stated that Hines cursed at her in front of several other employees, calling her a "GD bitch" and suggesting that she mind her own "F'ing business," all after informing her that a certain matter represented none of her "MF business." Katy Mitchell, a long-time Arkla employee who worked at *654 the Dalzell Street facility, testified that plaintiff directed identical language to her, and that she reported the incident to the superintendent. Billy Kline, who only temporarily worked in the dispatch office, also told of the supervisor's use of vulgar language, especially to the female employees. Although he recalled hearing the "F" word and "GD" with frequency, Kline could not give specifics of any touching of the women. Matthews testified, however, that Hines rubbed her shoulders on more than one occasion, causing her to order him to stop. Neither she nor Mitchell had worked under his supervision.
Earl Roberts, another member of the dispatch office, expressed to the investigators his desire not to be involved in any way. [This employee expected to retire about eighteen months later, and Sanchez described him as "in a protected age group."] At trial, Roberts said he had a good relationship with everyone in the building. Although he had never seen Hines touching the women or heard him using profane language, his office location prevented him from seeing all the activities in the dispatch area, and his work tasks generally kept him away from the other employees. He noted, as his sole comment about his supervisor's actions, that Hines could be nicer and should not treat people as he had in the past. However, this witness also believed that the other employees "took these things too personally."
As previously stated, in his effort to prove falsity of the statements from the eight individual defendants, plaintiff also called several witnesses. Tommy Weaver, who had occasion to visit the dispatch office briefly each day as foreman of the field personnel, acknowledged possible profanity by Hines in conversation but not any sexual harassment. Evan Young, who headed a work crew unassociated with Hines, also denied seeing any offending activities. Yet this latter witness only saw Hines occasionally, between the hours of 7:30 and 8:00 a.m. as the company chores began.
Phyllis Messer, who left Arkla in early 1984, said she did not see any offensive behavior during her four or five visits to the office after Hines became supervisor. She agreed, however, that foul language did not offend her and would not have made an impression upon her. Additional credibility questions arose when the witness conceded that she had been asked to resign from the company due to excessive absences, presumably related to her drug problem. As indicated by later testimony, Messer had also falsified insurance claims.
Raymond Smith, whom Arkla demoted for sexual harassment and whose similar suit against his employer remained pending at the time of trial, also testified on plaintiff's behalf. While refuting all charges levied against him personally, Smith simultaneously denied witnessing any of the activities attributed to Hines.[4] He admitted hearing curse words by plaintiff, but not as offensive as those described in the defendants' statements. Additionally, he conceded that Hines had touched the women's shoulders to get their attention, but declined to describe this as passionate rubbing.
Even so, Smith did specifically acknowledge one incident observed by him in the summer of 1985. While passing through the office, he noticed Hines place his hands on Sandra Wade's shoulder and ask her to obtain a ticket. As the two men walked away, Wade looked at Hines with a strange expression. This prompted Smith to caution Hines against touching anyone in such a manner, in that sexual harassment charges could result. The witness said he had intended this as a serious admonition. The Human Resources Department had very recently provided literature on the topic and, Smith believed, everyone "needed to kind of tone ... down" their actions.
During his own testimony, Hines denied each assertion made by the individual defendants. Nonetheless, while contending that he told nonoffensive jokes in the workplace, he admitted that the women could have considered these to be sexual in nature. *655 Although using profanity in the office, he said he never cursed at an employee. And despite testifying in deposition that he had rubbed the women's shoulders, at trial he strongly professed that he only placed his hands on their shoulders in order to get their attention as they sat at desk computers. When pressed on the subject, he conceded that he may have moved his fingers during the touching but he did not classify this as "rubbing." Furthermore, he claimed no sexual motive fostered the activity. He acknowledged, nonetheless, that both Vicki Cyrus and Patti DeBroeck asked him to discontinue such contact.
After reviewing the totality of the evidence, we find ourselves in a position analogous to that of Arkla's management when presented with the allegations in question. Aside from plaintiff's absolute denial, and the testimony of several people generally not in a position to witness the offending activities, we are faced with corroboration after corroboration. Thus, in sum and substance, the evidence preponderates against a finding of falsity and, instead, quite substantially favors truth within the statements made by these individual defendants.
Furthermore, the record discloses no proof of malice, notwithstanding plaintiff's contention that the employees conspired to discredit him because they regarded him as a tough taskmaster. Only when a statement is made without reasonable grounds for believing its truth can the author be said to have been actuated by malice or ill will. Elmer v. Coplin, 485 So.2d 171 (La.App. 2d Cir.1986), writ denied, 489 So.2d 246 (La. 1986).
When thoughtfully considered, the evidence here is more reflective of normal workplace friction than of maliciousness. Granted, plaintiff could cite instances of directing discipline at several of his subordinates. Yet most of the defendants did not even consider Hines's actions to be formal admonitions. Only Buddy Cyrus, who found his pay docked, became particularly angered by such an episode. Likewise, no more than one worker expressed a serious problem with revised office policies on cross-training and shift changes. Also, despite his earlier actions, Hines gave nearly all these same workers "commendable" ratings in the 1985 company evaluation, and failed to cite any problem with their performances.
In an obvious effort to buttress his contentions of bias and ill feelings on the part of the dispatch employees, Hines called Phyllis Messer. She claimed that, when the women of that office learned that plaintiff would be their supervisor, they stated both their dislike of him and their intent to have him relieved of the position. Yet Messer maintained that this conversation took place in late 1985 or early 1986, well after Hines had taken the post. This witness also asserted that, after plaintiff's resignation, she overheard Sandra Wade say that they had "got[ten] rid of the SOB." However, as previously mentioned, other evidence seriously assails Messer's credibility. Further, it is certainly conceivable that, after exposure to his persistent obscenities and offensive physical contact, the female employees within Hines's office could have beento say the leastharsh in their comments about him.
Hines's work force, if motivated by malevolence, likely would not have agreed to delete, from the original survey, any reference to his offensive language. Beyond that, the genesis of the investigation later came from a comment by Kline, an individual no longer even employed in the dispatch office.
Although the testimony reveals occasional episodes of dissension, such is an understandable component of many places of employment. More significantly, the record does not disclose disagreements rising to the level of dissatisfaction and malice suggested by Hines. Indeed, we find it highly implausible that these eight employees from a nine-person office force would cunningly join a plot to oust their supervisor, fabricate their several statements to that end, and then later perjure themselves as defendants in a court of law.
Thus, plaintiff having failed to demonstrate the essential elements of falsity and malice, his claim for defamation against the individual defendants must be rejected.

*656 ArklaDefamation

Next, in addition to similarly challenging the evidence of defamation, Arkla asserts the affirmative defense of privilege.
Liability for defamation does not attach from privileged publications or communication. Martin, supra; Toomer v. Breaux, 146 So.2d 723 (La.App.3d Cir. 1962), writ denied. With respect to an employer who undertakes an investigation of employee misconduct, a qualified or conditional privilege is enjoyed when making a statement in good faith, on a subject in which the communicator has an interest or duty, to one having a corresponding interest or duty. Roberts, supra. See also Martin, supra; Henderson v. Guillory, 546 So.2d 244 (La.App.2d Cir.1989), writ denied, 551 So.2d 635 (La.1989); O'Dell v. Deich, 496 So.2d 1074 (La.App. 4th Cir. 1986); Ward v. Sears, Roebuck & Co., 339 So.2d 1255 (La.App. 1st Cir.1976). Such a privilege arises from the social necessity of permitting free and unrestricted communication concerning matters in which the parties have a common duty or interest, and acts to protect good faith communicators from liability if the statement later turns out to be inaccurate. Martin, supra; Henderson, supra; Ward, supra.
During trial, two publications came to light that are attributable to Arkla. Richard Yeates, manager of operations and service in the division office, stated that he learned of Hines's departure from Nichols. At some point after the resignation in question, this latter official called four or five staff managers to a meeting. Among other topics of discussion, and without mentioning specifics, the vice president informed these individuals that Hines had been terminated for sexual harassment. Tommy Weaver, the previously mentioned foreman of field personnel at the Dalzell service department, said he received the same information at a larger meeting when Tabor made the disclosure to a group of approximately 48 field and service personnel within the department. Again, the statement did not contain specifics.
Within the context of qualified privilege, "good faith" means having reasonable grounds for believing that the statement is correct, but proof of ultimate truth is not necessarily required. Martin, supra; O'Dell, supra; Ward, supra. Hence, the first question we must address is whether the two representatives of Arkla made the statement that Hines had been terminated for sexual harassment in good faith, i.e., with reason to believe its truth.
Appellee argues that Arkla conducted an unreasonable investigation, and thus good faith on its behalf is negated. We disagree.
The investigation, of course, proceeded as discussed above. After concerns arose during the attitude survey and upon receiving Kline's rather specific comments, the Human Resources Department began their exploration. Following review of written statements taken from the three female employees, Sanchez reported to Nichols. Though the vice president initially expressed disbelief that such conduct could occur, he directed that further interviews be conducted. The investigators, upon approaching the remaining members of the dispatch office, then obtained information corroborating the women's previous revelations. Although all of the statements did not recite identical events, a definite pattern emerged, disclosing obscene language, sexual remarks, and inappropriate touching of the women by Hines.
By summoning each of the employees separately and without indication of the subject matter, Owens and Sanchez sought to keep their inquiry, and also the content of the accusations, confidential. Testimony further revealed that the investigators, during their questioning, garnered general information and attempted to avoid directly asking for corroboration. After such discussions, the interviewees reviewed, corrected, and signed their typed statements.
Appellee specifically complains that, in their investigation, Arkla management failed to offer him an opportunity to defend himself. While it is true that Nichols did not personally confer with plaintiff, Tabor nonetheless met with Hines on three occasions. During the second encounter, on *657 April 18, he protested and asserted his innocence, responding with specificity despite having been told only the nature of the allegations. Later, in calling Tabor at home that night, Hines questioned why Vicki's and Patti's husbands had been friendly to him if the events in question had indeed transpired. Tabor subsequently, in one of the several conferences, presented this information to Nichols.
Appellee additionally asserts that Arkla obtained statements from just the eight individual defendants. Yet only persons working within the dispatch office likely would have had an opportunity to observe the activity of which the employees complained. Notably, the witnesses offered by Hines at trial provided little assistance in this respect. Only Earl Roberts experienced long periods of daily work in the dispatch office. But, as stated, after requesting investigators not to involve him, he later testified that his duties precluded awareness of much occurring around him.
Of course, plaintiff's immediate superior, Raymond Smith, theoretically could have described some of the offending activity; however, the record suggests that interviewing this party would have jeopardized the confidentiality of the investigation and, perhaps, subjected the complainants to reprisal. Similarly, notwithstanding appellee's argument, it is quite clear that the corporate procedures manual neither covered this situation, nor delineated the administrative measures to be followed.
Nor is appellee's position strengthened by considering the disposition of the two communicators themselves, viz., Nichols and Tabor. As clearly shown by the record, the vice president conducted several meetings soliciting additional information from those conducting the investigation. Although the Human Resources Department originally recommended outright termination, both Nichols and Tabor favored the lesser penalty eventually imposed, retaining for Hines his unemployment benefits.
Thus, determining that Arkla conducted an appropriate and reasonable investigation, we find that the challenged publications occurred in good faith. Therefore, the next presented question concerns that of corresponding interests or duties.
Appellant correctly asserts that Arkla owed a duty to investigate allegations of sexual harassment, and that its employees additionally had a legitimate interest in knowing what activities could result in their termination. Clearly, an employer may investigate suspected wrongdoing without being liable for defamation because others become aware of the investigation and the subsequent discharge of particular employees. Roberts, supra; Thibodeaux v. Southwest La. Hosp. Assoc., 488 So.2d 743 (La.App.3d Cir.1986).
Although the case does not present a factual mirror of the instant matter, we are persuaded by the reasoning followed in Garziano v. E.I. Du Pont De Nemours & Co., 818 F.2d 380 (5th Cir.1987). There, after an investigation into an employee's sexual harassment of a co-worker, management distributed an information bulletin regarding company policy on the subject. That memorandum began by stating that the recent incident had been determined to involve a serious act, but then indicated the matter could not be discussed in detail. The communication noted, however, that the case concerned "deliberate, repeated, and unsolicited physical contact" and verbal abuse. Approximately 140 supervisors received the publication which they, in turn, summarized or read verbatim to their subordinates. Although the document did not name Garziano, no doubt existed as to whom it referred.
Mississippi law, the controlling jurisprudence in the Garziano decision, recognizes a qualified privilege, similar to our own, as a defense to defamation.[5] Indeed, the *658 standards and public policy behind each state's privilege are quite equivalent. In finding that the defendant's publication enjoyed such a privilege, the federal fifth circuit stated that, inasmuch as employees have a strong interest in not being fired, the bulletin disseminated information in which they had a legitimate interest, i.e., the reasons behind a fellow worker's discharge. The court went on to observe that an employer also has a strong interest in maintaining employee morale and in protecting its business interest. Even more specifically, the court mentioned the duty of employers, imposed by federal law, see Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq., to protect workers from sexual harassment, with prevention constituting the best tool to be utilized in that effort.
Likewise, in the present circumstances, we find that Arkla and its employees shared corresponding interests and duties.[6] Hence, the two publications at issue enjoyed a qualified privilege, requiring reversal of the defamation judgment against Arkla.

ArklaInvasion of Privacy
Finally, in light of the foregoing discussion, we further agree with Arkla's contention that it did not invade Hines's privacy. As this court previously explained in Muslow v. A.G. Edwards & Sons, Inc., 509 So.2d 1012, 1021 (La.App.2d Cir.1987), writ denied, 512 So.2d 1183 (La.1987), claims for invasion of privacy can stem from four types of infringements:
1) appropriation of the plaintiff's name or likeness for the use or benefit of defendant;
2) unreasonable intrusion upon plaintiff's physical seclusion or solitude;
3) publicity that unreasonably places the plaintiff in a false light before the public; and
4) unreasonable public disclosure of embarrassing private facts about the plaintiff.
In the case sub judice, the jury responses characterized the company's conduct as fitting the third and fourth categories of this cause of action.
The fourth circuit, in Klump v. Schwegmann Bros. Giant Supermarkets, Inc., 376 So.2d 514 (La.App. 4th Cir.1979), writ denied, 378 So.2d 1391 (La.1980), determined that a qualified privilege, as previously discussed, is also applicable to invasion of privacy cases. We agree. Obviously the same policy concerns, protection of communication between parties with a common interest or duty, relate to this cause of action as well.
In considering the defamation claim, we have previously found that a qualified privilege applied to Arkla's publications, the same publications challenged as invading plaintiff's privacy. Moreover, in finding "good faith," we determined that the company acted reasonably; and, unreasonableness is an essential element of delictual invasion of privacy. See Muslow, supra. Therefore, we likewise reverse the assessment of liability for invasion of privacy.

Other Matters
Having made the determination that the judgment against Arkla and the eight individual defendants must be reversed on the previously discussed grounds, we find it unnecessary to address appellants' remaining assignments of error.

CONCLUSION
Accordingly, for the foregoing reasons, the judgment is reversed at appellee's costs.
REVERSED.

APPLICATION FOR REHEARING
Before SEXTON, NORRIS, LINDSAY, HIGHTOWER and BROWN, JJ.
Rehearing denied.
NOTES
[1] Additionally, plaintiff withdrew a claim for age discrimination.
[2] We are mindful, of course, that Catanese, supra, contains dicta which can be interpreted to make the admissibility of such results discretionary in at least post-trial hearings.
[3] See, e.g., DeVries v. St. Paul Fire & Marine, 716 F.2d 939 (1st Cir.1983) (sustaining the exclusion of a refusal to take such a test); Aetna Ins. Co. v. Barnett Bros., Inc., 289 F.2d 30 (8th Cir.1961) (specifically holding such evidence inadmissible).
[4] Plaintiff also utilized this witness to pose the subject of polygraph tests again, eliciting testimony that Smith too offered to submit to such procedures.
[5] See generally Bush v. Mullen, 478 So.2d 313, 314 (Miss.1985) (recognizes qualified privilege with regard to "communications between employers and employees"); Hooks v. McCall, 272 So.2d 925, 927 (Miss.1973) (qualified privilege exists between those directly interested in the same matter); Louisiana Oil Corp. v. Renno, 173 Miss. 609, 157 So. 705 (1934) (leading case on the policy and scope of the employer-employee privilege).
[6] Although bearing distinctions from the matter at hand, to any extent that dicta comments in Melancon v. Hyatt Corp., 589 So.2d 1186 (La. App. 4th Cir.1991), writ denied, 592 So.2d 411 (La.1992), conflict with our present conclusion, we decline to follow the rationale of that decision.