715 So.2d 57 (1998)
Bahram ZAMANIAN, M.D., et al.
v.
CHRISTIAN HEALTH MINISTRY, et al.
No. 97-C-1460.
Court of Appeal of Louisiana, Fourth Circuit.
May 20, 1998.
*58 Bruce A. Cranner, Frilot, Partridge, Kohnke & Clements, L.C., New Orleans, for Defendants/Applicants.
Kyle D. Schonekas, Marc D. Winsberg, H. Minor Pipes, III, Stone, Pigman, Walther, Wittmann & Hutchinson, L.L.P., New Orleans, for Plaintiffs/Respondents.
*59 Before BARRY, KLEES and LANDRIEU, JJ.
BARRY, Judge.
Defendants sought review of the denial of a summary judgment in Dr. Bahram Zamanian's suit relating to Mercy Hospital's actions after a peer review.[1] This Court denied their application for supervisory writs (97-C-1460), and the Supreme Court granted certiorari and remanded for briefing, argument, and an opinion. (97-CC-2165).
On April 28, 1992 Dr. Zamanian, cardiologist, performed a percutaneous transluminal cardiac angioplasty (PTCA) at Mercy Hospital on a seventy-two year old female patient who died after part of the balloon catheter lodged in her heart. The Quality Care Review (QCR) committee chairman appointed an ad hoc committee to review Dr. Zamanian's actions. The ad hoc committee reported to the medical executive committee which basically adopted the ad hoc committee's recommendations. The medical executive committee appointed three doctors to make recommendations to Dr. Zamanian who refused to comply. Dr. Zamanian's privilege to perform PTCA was summarily suspended and he requested a hearing. After the hearing committee recommended reinstatement. The Board of Trustees restored Dr. Zamanian's privilege to perform PTCA conditioned upon several requirements relating to future PTCAs.
Dr. Zamanian filed for an injunction against Sr. Grant, President and CEO of Mercy Hospital, Dr. Angelica, Mercy Hospital Chief of Staff, Dr. Goodier, executive committee treasurer who signed the letter summarily suspending Dr. Zamanian, and Mercy Hospital. In an amended petition for damages and injunctive relief Dr. Zamanian named as defendants "Christian Health Ministry, formerly Southern Baptist Hospital, formerly Mercy Hospital of New Orleans, Inc. d/b/a Mercy + Baptist Medical Center" (Mercy Hospital), Drs. Culotta, Angelica, Goodier, and Harrison, and Nurse Benjawan Suksumake. Dr. Zamanian alleged a bad faith breach of contract against Mercy, tortious interference of contract against the doctors and nurse, and defamation, unfair trade practices, and intentional infliction of emotional distress against all defendants. Dr. Zamanian claimed that the purpose of the ad hoc committee was to find fault, that no CME training in angioplasty existed, no cardiologist at Mercy had such training, and his summary suspension occurred over two months after the patient's death. Dr. Zamanian alleged that the ad hoc committee did not investigate the possibility of product failure or the mortality statistics relating to angioplasty. He added that the committee failed to discover a possible delay in getting the patient to surgery because Nurse Suksumake pulled the sheath out of the artery during CPR and that the wire had been cut during the autopsy.

THE LAW
La. R.S. 13:3715.3(C) and Health Care Quality Improvement Act, 42 U.S.C. § 1101 et seq. provides qualified immunity for members of a peer review committee or any sponsoring entity on whose behalf the committee is conducting its review. The immunity covers any action taken or recommendation made within the scope and function of the committee if the member "acts without malice and in the reasonable belief that such action or recommendation is warranted by the facts known to him."[2] The legislative purpose of this provision was to encourage the medical profession to police its activities with minimal judicial involvement. Smith v. Our Lady of the Lake Hospital, Inc., 93-2512 (La.7/5/94), 639 So.2d 730. Under 42 U.S.C. § 11112(a) immunity applies only if action was taken: 1) in the reasonable belief that the action was to further quality health care; 2) after a reasonable effort to obtain the facts; 3) after adequate notice and hearing procedures are afforded to the physician or after such other procedures as are fair under *60 the circumstances; and 4) in the reasonable belief that the action was warranted by the facts known after a reasonable effort to obtain facts and after meeting (3).
Smith analogized the qualified immunity to the conditional privilege of employers in defamation cases and adopted the latter's two step approach. Initially, the court must decide as a matter of law whether the defendant(s) are peer review committee members whose actions were part of the review process. Next, it must determine whether there was an abuse of the peer review process which is a fact question. The assertion of qualified immunity constitutes a rebuttal of the allegation of malice and places the burden on the plaintiff/physician to establish malice or lack of good faith. Boyd v. Community Center Credit Corporation, 359 So.2d 1048 (La.App. 4 Cir.1978). Mere allegations of malice and bad faith without specifications of personal animosity will not be sufficient. Smith, 639 So.2d at 730. "[W]ithout malice" and "in the reasonable belief that such action or recommendation is warranted by the facts known ...." has been interpreted to mean "good faith". Id. Good faith means having reasonable grounds for believing that the statement is correct, but proof of the ultimate truth is not required. Hines v. Arkansas Louisiana Gas Company, 613 So.2d 646 (La.App. 2 Cir. 1993), writ denied 617 So.2d 932 (La.1993).
To consider whether there was malice the court must focus on whether the motivating purpose was something other than that for which the privilege was intended to protect. Malice means "a primary purpose other than the safeguarding of the patients." Smith, 639 So.2d at 749. Lack of malice or good faith exists when peer review committee members are shown to have a reasonable basis for their action or recommendation made during the peer review process. Id.
Appellate courts review summary judgments de novo under the same criteria used by the district court. Gibson v. Roberts, 97-0454 (La.App. 4 Cir. 10/15/97), 701 So.2d 501. Summary judgment is now favored. La. C.C.P. art. 966 C as amended by Act 483 of 1997 provides:
(1) After adequate discovery or after a case is set for trial, a motion which shows that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law shall be granted.
(2) The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.
Act 483 of 1997 has been applied retroactively. Young v. Dupre Transport Company, 97-0591 (La.App. 4 Cir. 10/1/97), 700 So.2d 1156, citing Kaufmann v. Fleet Tire Service of Louisiana, 97-1428 (La.9/5/97), 699 So.2d 75. The preamble to Act 483 indicates that the purpose of art. 966(C) was to establish and allocate the burden of proof. Section 4 of the act states that its purpose is to clarify the 1996 amendment to art. 966 and legislatively overrule all cases inconsistent with Hayes v. Autin, 96-0287 (La.App. 3 Cir. 12/26/96), 685 So.2d 691, writ denied 97-281 (La.3/14/97),690 So.2d 41. Hayes adopted the federal courts' liberal standard for a summary judgment. Ernest v. Dillard Department Stores, 97-2052 (La.App. 4 Cir. 12/17/97), 703 So.2d 1380. The 1997 amendment substantially changes the law and it legislatively overrules the jurisprudential presumption against summary judgment. Davis v. Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, 97-0382 (La.3/18/98), 709 So.2d 1030.

THE RECORD
In support of their summary judgment motion the defendants submitted seventy-three *61 exhibits including depositions, transcript excerpts, and documentation. The following is gleaned from the exhibits.
Pursuant to Mercy Hospital's Constitution and by-laws the Quality Care Review Committee chairman, Dr. Harrison, appointed Drs. Culotta, Ploger, and Landry to an ad hoc committee to review the matter. According to its report, the committee met with Dr. Zamanian, catheterization lab personnel present during the procedure, and three Mercy cardiologists The committee discovered that Dr. Zamanian had never attended a "hands-on" continuing medical education course relating to the angioplasty procedure; he did not remove the balloon catheter system en bloc when problems were encountered; he attempted PTCA on two vessels when the patient had an occluded right coronary artery; and the catheter fragment contributed to the patient's death. In its report the committee recommended: Dr. Zamanian attend at least a three day continuing education course on angioplasty prior to performing another PTCA; he be required to obtain a second opinion from a board certified Mercy cardiologist on his next fifty PTCA cases; and he not be allowed to perform a PTCA if the second opinion doctor disagrees.
According to the June 29, 1993 minutes, the medical executive committee (Drs. Angelica, Ruli, Shackleton, Goodier, Jeanfreau, Sartin, Brunner) approved the ad hoc committee's recommendations with the modification that the second opinion cardiologists selected must have performed an average of one or more PTCAs a month at Mercy Hospital. Guests at the meeting included Drs. Culotta and Cerise, Mark Stauder, Mercy Hospital Chief Operating Officer in 1993, and Janet Davis, Mercy Hospital administrator. The committee appointed Drs. Angelica, Cerise and Dr. Culotta to present the recommendations to Dr. Zamanian.
According to Dr. Angelica, Dr. Zamanian rejected the recommendations. Dr. Zamanian was advised by a July 1, 1993 letter that his privilege to perform PTCA was summarily suspended pursuant to Part 28.03 of the hospital's by-laws. Part 28.03(a) provides: "A member of the Medical Staff may be summarily suspended whenever his/her conduct may require that immediate action be taken to protect the life of any patient or to reduce the substantial likelihood of immediate injury or damage to the health or safety of any patient, employee, or person present in the Hospital." Part 28.03(b) provides that the Chief Executive Officer (or his designee) in conjunction with the medical executive committee, President and Chief of Staff have the authority to summarily suspend.
According to the July 1, 1993 letter the action was taken because: he had not taken a "hands on" CME course in PTCA; his selection of the patient for PTCA was wrong; the technique to remove the catheter was questionable; and he failed to recognize the broken angioplasty catheter system. Dr. Angelica, Dr. Goodier, and Sr. Grant signed the letter. Sr. Grant testified that the letter was an expression of the executive committee's intent and she did not inform the committee that the summary suspension letter was being sent to Dr. Zamanian.[3]
According to the committee report, Dr. Zamanian requested a review by the hearing committee and five days of testimony were heard. The hearing committee (Drs. Kitziger, Garcia-Oller, Lousteau, Sanders, and Tebbe) rejected the summary suspension of Dr. Zamanian and recommended terminating the suspension. The committee noted that Part 28.02(b)(3) of the bylaws was ignored whereby Dr. Zamanian was entitled to a hearing before a committee (under Part 29) if the recommendation was adverse, that Dr. Zamanian had been ordered to attend a course which did not exist, and he had been ordered to consult a Mercy cardiologist who might not exist. The committee stated that it heard differing expert opinions about multi-vessel procedures and the selection of the particular patient for a PTCA, as well as the possibility that shearing off the catheter was caused by a defect. The committee concluded the various committees had been in good *62 faith and recommended restoring Dr. Zamanian's staff privileges.
According to minutes of a January 18, 1994 meeting the Board of Trustees reinstated Dr. Zamanian's privileges, but required that the next fifteen of Dr. Zamanian's angioplasty cases be monitored by a Mercy cardiologist, that his next fifteen cases be monitored in the cath lab by a Mercy cardiologist, that the cath lab send reports to the executive committee and the board of trustees, and that requirements as to continuing education were to be set by Mercy's cardiac catheterization committee.
Dr. Zamanian submitted twenty exhibits plus deposition and hearing committee transcript testimony excerpts and argued that the defendants did not act in good faith. In his affidavit Dr. Zamanian noted his extensive training in PTCA procedures including a CME course (information which he told the ad hoc committee but was not passed on). He pointed out that shortly before the subject incident Mercy reappointed him to the staff with full privileges including performing PTCAs. He stated that his deceased patient was high risk (for surgery or PTCA) because of multiple blockage of her arteries, her age, diabetes, and prior heart failure, but she chose angioplasty after being informed of the options.
In an affidavit Dr. Angelo, an internist who referred patients to Dr. Zamanian, declared that he never recalled a death being formally investigated, much less resulting in a summary suspension at Mercy Hospital. He felt the suspension was totally unjustified. Drs. Harrison and Angelica, who had been at Mercy Hospital for many years, testified that they knew of no other investigation or such sanctions imposed on a doctor. Sr. Grant recalled no other summary suspension in her seven years at the hospital. Dr. Harrison noted another death had occurred in the cath lab (about the same time) that was not investigated. According to the May 18, 1993 QRC minutes, the committee considered a physician who was allegedly intoxicated and gave inappropriate orders for treatment, but that doctor was not suspended. Dr. Angelica conceded in testimony that Dr. Zamanian's case did not require immediate action to protect patients.
Dr. Zamanian also attached a copy of Dr. Harrison's May 26, 1993 letter to the committee which instructed them to review Dr. Zamanian's "entire pattern of practice," not just the subject case. He noted that the ad hoc committee consisted of a gynecologist, a radiologist, and an orthopedic surgeon and the Mercy cardiologists consulted by the committee were his competitors. The only non-competing cardiologist was Dr. Deane, a St. Louis doctor whom Mark Stauder had contacted. According to Stauder's testimony, he gave to Dr. Culotta Dr. Deane's July 7, 1993 report, which concluded that Dr. Zamanian's patient was an acceptable candidate for angioplasty and he would have offered angioplasty to the patient as the first alternative procedure. Based on their testimony the ad hoc committee members were not aware of Dr. Deane and had not reviewed his letter. Neither Stauder, who was present at the hearing, nor Dr. Culotta, who testified before the hearing committee, turned over Dr. Deane's report to the committee. Dr. Zamanian did not obtain a copy of Dr. Deane's report until it was attached to the defendants' supplemental answers to interrogatories dated September 12, 1996; the defendants answered that Dr. Culotta could not remember the name, address, or telephone number of the physician in St. Louis, but then provided Dr. Deane's report. Dr. Culotta's ad hoc committee report did not mention Dr. Deane. In his testimony Dr. Deane stated he was told that his opinion was requested for an internal quality and improvement review, not a disciplinary proceeding. He said there was no basis to discipline Dr. Zamanian due to his decision to do a multi-vessel angioplasty.
Dr. Zamanian claims that Dr. Culotta made misrepresentations before the executive committee. He argues that Dr. Culotta's ad hoc committee report and testimony contained misrepresentations and omissions as to the opinions of the three Mercy cardiologists consulted, Drs. Smith, Mautner, and Pappas, and Dr. Deane's opinion. According to Dr. Culotta's report, the three Mercy cardiologists stated that only high profile, high *63 volume doctors would have attempted the angioplasty and two said that the attempt was below the standard of care and there was substandard performance of the procedure. That assessment was not reflected in the doctors' testimony. Dr. Mautner testified that he did not feel the case was inappropriate for PTCA. Dr. Pappas said that most cardiologists would not have done a PTCA on the patient. Dr. Smith testified that Tulane and Ochsner would have performed a PTCA in such a case, but he would not have attempted a multi-vessel procedure. The cardiologists did not review the patient's records or discuss the case with Dr. Zamanian; they reviewed the angiogram. According to Dr. Angelica's testimony, Dr. Culotta misrepresented to the hearing committee that Dr. Deane felt that PTCA was highly risky for Dr. Zamanian's patient.
Dr. Zamanian also notes: Dr. Culotta's testimony that the committee did not investigate whether a defect in the catheter could have been the cause (Dr. Harrison so testified); Dr. Culotta's testimony that Dr. Zamanian admitted that he did not use fluoroscopy to monitor manipulation of the catheter (his notes to document that admission were lost); and Nurse Suksumake's testimony that she pulled the sheath of the artery during the procedure (which delayed the chance to take the patient to surgery).
According to June 29, 1993 minutes of the meeting, the executive committee members did not directly vote on summary suspension of Dr. Zamanian's privilege to perform PTCA. Dr. Zamanian notes discrepancies in Dr. Angelica's testimony before the hearing committee related to how the decision to suspend was reached. The hearing committee found: the CEO and doctors acting in an ex-officio manner suspended Dr. Zamanian without regard to the expectations of Dr. Harrison, the ad hoc committee, the QCR committee; that the reason for the suspension "appears clouded"; and the suspension was based on a poor interpretation of the bylaws and exceeded the intent of the committee members.
Dr. Zamanian also submitted a copy of Dr. Angelica's January 4, 1994 letter to members of the Board of Trustees reaffirming the executive committee's recommendation to summarily suspend Dr. Zamanian's privilege to perform PTCA (even though it is not clear that the executive committee so decided). According to the January 18, 1994 minutes, the Board reinstated Dr. Zamanian, with specified conditions.
Dr. Zamanian attached a copy of the bylaws and argued that Part 28.03 was a drastic remedy and doctors involved in his peer review did not recall its prior use. Dr. Zamanian focused on the testimony of members of the ad hoc committee, Drs. Angelica, Goodier, and Ploger, who could not recall similar investigations. Dr. Ploger testified that he thought the requirement that fifty cases be monitored was excessive. Dr. Zamanian claims that the hearing committee which conducted the investigation and heard testimony exonerated him, but the Board of Trustees without taking any additional evidence imposed conditions upon Dr. Zamanian's reinstatement.
Dr. Zamanian claims the motive behind his summary suspension and other disciplinary action was Mercy Hospital Administration's financial concerns relating to his practice. He had excessive variance days (days the patient remained in the hospital after the time permitted by Medicare or insurance companies), which caused the hospital great losses. Dr. Cerise and Janet Davis had brought pressure to decrease variance days. In his affidavit Dr. Angelo declared that Sr. Grant and Stauder pressured the doctors about the length of stay for Medicare and Welfare patients. According to Dr. Angelo, the hospital administration was "intent on getting rid of any physician whom it perceived was losing money for the hospital" and that desire targeted Dr. Zamanian.
In his affidavit Dr. Zamanian stated that he received information quarterly on his financial performance, length of stay, and variance days. According to the PTCA Analysis 5/31/91-7/31/93 report, Dr. Zamanian had the most (31) variance days. He submitted the letter and graphic representations sent by Janet Davis, Mercy Administrator, on February 1, 1993. The graphs compared: the dollars in hospital cost to Medicare reimbursement for each cardiologist for the period *64 10/92-12/92; the length of stay attributed to each cardiologist and the average length of stay; and the variance days to the occupied days. He also attached documentation sent with Davis' May 24, 1993 letter which showed that he did poorly in 1992, and worsened in 1993. According to quarterly statistics printed August 13, 1993 which showed the cost, reimbursement, and net margin, Dr. Zamanian had huge negative net margins for the four quarters.
According to Davis' testimony, she sent out quarterly "case mix reports" which summarized the hospital's projected reimbursement from Medicare and other sources compared to the fully allocated costs of caring for patients. Davis stated the hospital lost $879,780 due to Dr. Zamanian from July 1992 to June 1993. She had spoken to him about hiring a nurse to move faster through the system. Although he was told about the losses, Dr. Zamanian did not send patients home because of financial and not medical reasons. According to Sr. Grant's testimony, the hospital had no recourse against a doctor with a large number of variance days.

ANALYSIS
Drs. Culotta, Angelica, Goodier, and Harrison, who were involved in the peer review process, are able to invoke statutory immunity only if they acted without malice and in the reasonable belief that their actions were warranted by the facts. The qualified immunity of La. R.S. 13:3715.3(C) rebuts the plaintiff's allegations of malice and places the burden on the plaintiff/physician to establish malice or lack of good faith. Smith, 639 So.2d 730. Under La. R.S. art. 966 C(2) (as amended in 1997) Dr. Zamanian had to oppose the summary judgment motion by producing factual support to establish that he will be able to satisfy his evidentiary burden of proof at trial.
Dr. Zamanian has produced testimony, evidence, and documentation to show problems with the peer review process at Mercy Hospital. There were misrepresentations to committees, inconclusive evidence of wrongdoing by Dr. Zamanian in the PTCA procedure, the unprecedented and perhaps unjustified summary suspension of his privilege to perform PTCA, the failure to provide the out-of-town independent cardiologist's favorable report to the peer review committee members or to Dr. Zamanian for over two years, and substantiated allegations that Mercy Hospital had financial reasons to discipline Dr. Zamanian. Dr. Zamanian produced evidence of his number of variance days, poor quarterly financial showing, and large hospital losses attributable to his decision to keep patients hospitalized for more days than Medicare authorized. Janet Davis and others testified as to Dr. Zamanian's conservative medical policies.
There are genuine issues of material fact as to whether defendants can invoke the statutory qualified immunity, whether peer review committee members possessed a motivating purpose other than that for which the privilege was intended, or whether the primary purpose was other than safeguarding patients.
The summary judgment motion was properly denied. The judgment is affirmed.
AFFIRMED.
NOTES
[1] Dr. Zamanian filed individually and on behalf of the medical corporation. Plaintiffs will be referred to as Dr. Zamanian.
[2] Prior to the 1995 amendment, La. R.S. 13:3715.3 C did not contain language to include the hospital or sponsoring entity. Because of our disposition in this matter, the retroactivity of the amendment is immaterial.
[3] The testimony used in the opinion refers to that taken before the hearing committee or deposition testimony.