**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**William A. BOWEN,
Defendant–Appellee.**

**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**Kevin W. JARVIS, Defendant–Appellee.**

**Nos. 87–5156, 87–5180.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 3, 1988.

Decided Sept. 22, 1988.

---

Nancy L. Worthington, Asst. U.S. Atty., San Diego, Cal., for plaintiff-appellant.

Michael Pancer and Eugene G. Iredale, San Diego, Cal., for defendants-appellees.

Before HUG, KOZINSKI and THOMPSON, Circuit Judges.

HUG, Circuit Judge:

This is an interlocutory appeal by the Government. The district court granted a suppression motion made by the defendants to exclude evidence relating to a polygraph examination given to one of the defendants and other evidence relating to an alleged conspiracy by the defendants to cover-up the circumstances during and after the examination. This appeal presents the issue of whether results of a polygraph examination and other evidence of the surrounding circumstances of the examination were properly excluded from trial as too prejudicial when the purpose of the evidence was to show that the results of the polygraph examination were fabricated as a part of a conspiracy. We affirm.

## I.  FACTS

The parties present two entirely different versions of the facts leading up to this interlocutory appeal.

The Government essentially alleges that a United States border patrol agent senselessly attacked and beat up a man who was out target practicing near. the California–Mexican border. The Government describes the victim as a licensed doctor who is an American citizen of Mexican descent. In addition, the Government charges that the two border patrol agents conspired with a private polygrapher to cover-up the incident by falsifying the polygraph results and then when called on it, made it seem as if the graphs showing the results were lost in the mail.

The defendants—the two border patrol agents and the private polygrapher—tell a different story. They say that the initial incident was a legal arrest by the two border patrol agents and that the man arrested was a convicted marijuana smuggler who was firing shots near one of the agents. The reason that the man was hurt, say the defendants, was because he violently resisted arrest.

### A.  The Government's Version

On May 5, 1985 at approximately 4:30 in the afternoon, Dr. Jose A. Cisneros was target practicing when he suddenly realized that someone was yelling at him. He looked around, but could not see anyone. He was afraid that there might be some trouble and so he got into his car and drove away.

Ken W. Jarvis, the border patrol agent who had yelled at Cisneros, called his partner, William A. Bowen. Bowen, driving his patrol car, caught up with Cisneros first. Bowen was standing beside his car with his gun pointed at Cisneros, when Jarvis arrived and blocked Cisneros' car. Jarvis got out of his car and began screaming at

Cisneros to lie on the ground. Cisneros complied. While Cisneros was lying face down in the dirt, Jarvis screamed obscenities at him, handcuffed him behind his back, and kicked him several times. Bowen stood by and watched, still pointing his gun at Cisneros.

The local sheriff's deputies were called. The deputies arrived and helped Cisneros into their car. They drove to the sheriff's office.

Meanwhile, Bowen and Jarvis wrote a complaint, alleging assault on a federal officer by Cisneros. Additionally, they wrote a memorandum to their superior at the border patrol agency based on their version of the story. The sheriff's office did not file the complaint; instead, the deputies called the FBI. The FBI interviewed all three men. Cisneros told the FBI how he had been kicked; Bowen and Jarvis said that there was no kicking, that Cisneros was resisting arrest.

Jack Feemster, an agent from the Immigration and Naturalization Service, Office of Professional Responsibility ("INS"), investigated the complaint. He interviewed the three men, who repeated the same story that they had told to the FBI. Because of the conflicting accounts, Feemster asked the men if they would submit to a lie detector test. All three said that they would.

Feemster called Bonsall to conduct the polygraph examinations. Bonsall first tested Jarvis. After the examination, Bonsall called Feemster and told him that Jarvis had passed the polygraph test "with flying colors."

Cisneros wanted to be tested by someone other than Bonsall because he had heard that Bonsall's reputation as a polygrapher was poor. Cisneros was therefore tested by an FBI agent. At about this same time, Feemster learned that Bonsall and Bowen knew each other. Feemster arranged for Bowen to have an appointment with the same FBI agent who had tested Cisneros. Bowen failed this examination. However, when he admitted that he had seen Jarvis kick Cisneros, he passed.

Feemster, who was now curious as to how Jarvis had passed his lie detector test, immediately confronted Bonsall with Bowen's examination results. A meeting was arranged but Bonsall did not show up. He later claimed that he mailed the polygraph results to Feemster on September 29, 1985, which was the day before the meeting was scheduled. Feemster received no such results. A water soaked manila folder, which he did receive from Bonsall, contained only a conclusory report by Bonsall and some documents relating to the investigation which Feemster had given to Bonsall earlier.

On September 29, a postal worker noticed a large manila envelope addressed to a government office in the mail box. The envelope was torn. She searched the mailbox to see if anything had fallen out of the envelope. She found nothing loose in the box so she taped the envelope and stamped it "Received Unsealed at El Centro, CA 92244." The Government contends that Bonsall tried to make it look like the envelope was damaged in the mail and the graphs were therefore lost.

### B. *The Defendants' Version*

The defendants' version of the incident begins with Jarvis, who was on patrol near the Mexican border. Jarvis spotted fresh tracks near a canal, which indicated that aliens might have illegally entered the United States. He followed the tracks up into some brush where he heard gun shots. Several of the shots landed nearby. He identified himself as a border patrol agent and shouted to cease fire. Two more shots were fired in his direction. Jarvis shouted again, telling the perpetrator to cease fire and to stay where he was. Cisneros, who was firing the shots, ignored Jarvis, got into his car, and drove away. Jarvis followed Cisneros and, while driving, contacted Bowen, telling him to head off Cisneros.

After Jarvis caught up with Cisneros, he asked him to raise his hands, but Cisneros started to run instead. Since Cisneros was resisting arrest, Jarvis had to tackle and handcuff him in order to subdue him. Jar-

vis told Cisneros that he was under arrest and then read him his rights.

Jarvis took a polygraph examination by Bonsall and passed with flying colors, and there was no indication that the result was fabricated. Jarvis took a second polygraph examination by another polygrapher and passed. In this examination, Jarvis denied ever kicking Cisneros.

### C. *The Procedural History*

On April 30, 1986, a federal grand jury returned a nine-count indictment against Bowen, Jarvis, and Bonsall. The indictment essentially charged Jarvis with violating Cisneros' civil rights and all three men with conspiracy and making false statements to federal officers.

On June 26, 1986, Bowen and Jarvis moved to dismiss the counts in the indictment which charged them with making false statements to federal agents in violation of 18 U.S.C. § 1001 (1982). The court dismissed all of the section 1001 counts against Jarvis and one against Bowen. *United States v. Jarvis,* 653 F.Supp. 1396, 1397 (S.D.Cal.1987). At the same time, Bowen, Jarvis, and Bonsall made a motion to sever their trials. The court granted the motion for severance of the defendants' trials on October 30, 1986.

In connection with the motion to sever and throughout the entire pretrial proceedings, the Government assured the court that the polygraph evidence would not be put into evidence and used against Bowen and Jarvis. On July 7, 1986, for example, the Government stated for the record that "certain polygraph evidence relevant and admissible as to Bonsall would not be admissible as to Jarvis and Bowen." On December 12, the Government stated to the court in even stronger terms that, "[t]here's been an *agreement* that mention of the polygraph will not be made...."

On April 29, 1987, the grand jury superseded the original indictment, adding two new charges of section 1001 violations, one against Bowen and one against Jarvis. As the case now stands, each defendant is charged in three counts.

Count 1 charges Jarvis with violating Cisneros' civil rights pursuant to 18 U.S.C. § 242 (1982). Count 2 charges him with conspiracy to defraud the United States in violation of 18 U.S.C. § 371 (1982). To support the conspiracy charge, the Government lists six overt acts. Among the listed acts are three which state that Jarvis met with Bonsall, who after the meeting, prepared a false polygraph examination report for the INS. The indictment next focuses on the alleged attempt to cover up the circumstances surrounding the polygraph examination. Count 3 charges Jarvis with making false statements in violation of 18 U.S.C. § 1001.

Bowen is charged with the Count 2 conspiracy—although the indictment does not link him with Bonsall's falsification of polygraph results or the subsequent cover-up. The Government is basically linking him with the conspiracy by charging him with causing Cisneros to be arrested and making false statements in furtherance of the conspiracy. Counts 4 and 5 charge Bowen with making false statements in violation of section 1001.

Bonsall is charged with the Count 2 conspiracy, with two counts of making false statements in violation of section 1001, and with one count of mail fraud.[1]

Bowen's trial date was set for May 19, 1987. In mid-April, the United States Attorney's Office told the defense counsel that a new Assistant United States Attorney, Maria Arroyo–Tabin, was assigned to the case. Arroyo–Tabin advised the defense counsel that she intended to use the polygraph-related evidence in Bowen's trial. On May 8, 1987, the defense filed a motion to exclude the polygraph-related evidence. The district court granted the motion.

On May 20, 1987, the Government filed a Fed.R.Crim.P. 12(e) motion requesting the district court to rule in advance on the admissibility of the polygraph-related evidence in the trials of Jarvis and Bonsall.

---

1. Bonsall did not join in the motion to suppress; therefore, he is not part of this appeal. His role in the affair will be discussed only as relevant to Bowen and Jarvis.

Jarvis responded; Bonsall did not. The district court ruled that the evidence was to be excluded from Jarvis' trial. The district court then rejoined *sua sponte* Bonsall's case with Jarvis'. As the case now stands, there will be two trials, one trying the charges against Bowen and one trying the charges against Jarvis and Bonsall.

There appear to be complications under the district court's order if the Jarvis and Bonsall trials remain joined and the polygraph evidence is admissible against Bonsall but not against Jarvis. We do not consider this matter since the trials may or may not remain joined.

## II. ISSUE

Whether the district court correctly excluded polygraph-related evidence from the trials of Bowen and Jarvis.

## III. DISCUSSION

We review the district court's decision to exclude the polygraph-related evidence for an abuse of discretion. *United States v. De Rosa*, 783 F.2d 1401 (9th Cir.), *cert. denied*, 477 U.S. 908, 106 S.Ct. 3282, 91 L.Ed.2d 571 (1986).

█ It is well settled in this circuit that polygraph evidence is disfavored and cannot be introduced into evidence to establish the truth of the statements made during the examination. *Brown v. Darcy*, 783 F.2d 1389, 1391 (9th Cir.1986). Thus, if the evidence is being offered to prove the truth or falsity of the polygraph results, then the evidence is inadmissible. However, polygraph evidence which is an operative fact may be admissible. *Id.* at 1397.

█ The key to its admissibility as an operative fact is the purpose for which it is being introduced. If the polygraph evidence is being introduced because it is relevant that a polygraph examination was given, regardless of the result, then it may be admissible; or if the evidence is being introduced as a basis for a cause of action, then it may be admissible as well. *Id.*

The Government offers the polygraph-related evidence as substantiation of a conspiracy between Bowen, Jarvis, and Bonsall. The Government is not offering the evidence to prove the truth or falsity of the results of the examination. Clearly, this evidence concerning the polygraph results and the evidence surrounding the examination are being offered as proof of the conspiracy charge—an operative fact—and, therefore, could be admissible.

█ However, even when being introduced for this limited purpose, the polygraph evidence to be admissible must be more probative than prejudicial. Fed.R. Evid. 403 provides for an exclusion of evidence when the potential prejudicial harm substantially outweighs the probative value of the evidence. A trial court's balancing of the probative value of the evidence against its prejudicial harm under Fed.R. Evid. 403 is reviewed for an abuse of discretion. *United States v. Rubio*, 727 F.2d 786, 798 (9th Cir.1984).

Fed.R.Evid. 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." Prejudice does not mean that the defendant's case is merely damaged, for the more probative the evidence is, the more damaging it is apt to be. Nor does prejudice necessarily mean that emotions will not enter the jury deliberations. Rather, prejudice outweighs probative value where the facts arouse the jury's feelings for one side without regard to the probative value of the evidence, or in other words, if the jury is basing its decision on something other than the established facts and legal propositions in the case. E. Cleary, *McCormick on Evidence* § 185 (3d ed. 1984).

The trial court excluded the polygraph evidence on two grounds. First, the court found that a jury would be reasonably likely to infer from the evidence that Jarvis did indeed fail the polygraph examination. The jury would thus be likely to infer from this polygraph result that Jarvis was guilty of the underlying charge of the civil rights violation, and Bowen was guilty of the false statements charge. The possible prejudice to Bowen and Jarvis is significant

and adequately supports the district court's conclusion that the prejudice substantially outweighs the probative value of the polygraph evidence to the conspiracy charge. Furthermore, the admission of the evidence of Jarvis' first polygraph examination would lead to the legitimate request for the admission of the second examination, which he contends he passed. This leads to the very contest among polygraphers that is deplored in *Brown v. Darcy.* There was no abuse of discretion in excluding this evidence from the trial.

■ Second, the trial court noted the Government's questionable conduct concerning the use of the polygraph evidence at trial. Numerous times the Government represented to the defense and to the court that they would not seek admission of the polygraph evidence at trial.

The Government even admitted to the court that it had made an agreement with the defense that the polygraph would not be mentioned. And yet approximately one month before trial, with a newly substituted Assistant United States Attorney in charge of the case, and with the trials aligned as they were, the Government reversed its position thereby placing the defense in a position where it had to move to suppress. The Government then filed this appeal, occasioning a great deal of unnecessary delay because of its change of position.

Had the Government wanted the polygraph evidence to prove the conspiracy charge, it should have made its intention clear to the court and to the defense in the early pretrial proceedings. Instead, the Government led everyone to believe that it would not seek to use any evidence related to Jarvis' polygraph examination in the Bowen or Jarvis trials. This last minute change of position, occasioning this delay in the trials, is beneath the standards we expect of our public prosecutors.

AFFIRMED.