UNITED STATES of America, Plaintiff,

v.

John I. PITNER, et al., Defendants.

No. CR96–500C.

United States District Court,
W.D. Washington.

June 23, 1997.

Susan Blair Dohrmann, Seattle, WA, for U.S.

James E. Lobsenz, Seattle, WA, for Pitner, James M. Roe, Seattle, WA, for Mack, David Zuckerman, Seattle, WA, for Kuehnoel, Montell E. Hester & Brian R. Phillips, for Fisher, Thomas W. Hillier, II, Seattle, WA, for John Kirk, Howard Ratner, Seattle, WA, for Judy Kirk, Kenneth W. Sharaga, Federal Way, WA & Terrence Kellogg, Seattle, WA, for Burton, Robert Leen, Seattle, WA, for Smith, Walter George Palmer, Seattle, WA, for Carter, Michael G. Martin, Seattle, WA, for Hansen, Peter A. Camiel, Seattle, WA, for Pitner.

## ORDER

COUGHENOUR, District Judge.

This matter came before the Court on the motion of the government to exclude evidence of a polygraph examination that was administered to Edwin G. Maeurer. At the request of defendants the Court conducted an evidentiary hearing to determine the admissibility of the polygraph examination evidence. This hearing was conducted on January 7, 1996. Following the hearing the Court orally ruled that the results of the polygraph examination would not be admitted, but that the operative fact of the polygraph examination would be admitted. This Order will outline the Court's reasoning.

### I. Background

The government in this matter charged several defendants with a conspiracy to make, possess and transfer illegal firearms and destructive devices, and to assault, kill or attempt to kill federal officers. The government also charged various defendants with the possession and transfer of illegal firearms and destructive devices. Defendants are all tied to "Militia" or "Freemen" groups.

During the course of the government's investigation an informant, Edwin G. Maeurer, infiltrated the ranks of the Washington State Militia. He reported to FBI special agent Ramon Garcia that he had seen some weapons and explosives in the garage of defendant John I. Pitner. Specifically, he said he had seen three M–16 rifles, that he was familiar with these rifles as a result of his military experience, that he had seen the inscription "M–16" on the side of one rifle, and that he had fired one rifle in fully automatic mode. Maeurer also said that he had seen several boxes of dynamite and hand grenades, and that he had handled these items.

Garcia asked Maeurer to take a polygraph examination to confirm whether these representations were true. Garcia also wanted to confirm other statements made by Maeurer. Maeurer had previously taken a polygraph exam on other issues on August 15, 1995.

## A. Polygraph Examination.

Maeurer took a polygraph examination concerning the items he saw in Pitner's garage and some other matters on February 20, 1996. The examination was administered by FBI Special Agent Raymond Lauer, who had also administered the first test. Lauer had seventeen years of law enforcement experience. He attended the Department of Defense Polygraph Institute, which includes 14 weeks of instruction on polygraphy, psychology, physiology, and pharmacology. He graduated from the program in November 1994. At the time he first worked with Maeurer, he had administered approximately 65 to 70 polygraph examinations.

Prior to the February 20, 1996 test Lauer interviewed Maeurer. Maeurer changed his story during the interview. He said that he had seen three guns hanging on hooks in Pitner's garage, but had not actually handled or fired a gun and did not see an M–16 inscription on the side of a gun. He also qualified his earlier statements by explaining that although the guns looked like M–16's, they could have been AR–15's, .22 caliber guns, or even toys. He also said that he had not handled any dynamite, but that he did see two boxes that he believed contained 50 sticks of dynamite.

After the preliminary interview Lauer administered the test on this and other subjects. After examining the results Lauer concluded that Maeurer gave answers that were indicative of deception to the following questions:

Q. Did you lie when you said you saw those guns in Pitner's garage?

A. No.

Q. Did you lie about seeing the dynamite boxes in Pitner's garage?

A. No.

Following the polygraph examination Lauer conducted another interview with Maeurer, in which he confronted Maeurer with the results of the examination and in which Maeurer further retrenched. He said that the lighting was dim in Pitner's garage, and that he really wasn't positive that he saw three guns. However, he said he was certain that he saw at least one gun hanging on the wall, and that the gun looked like an M–16. Maeurer again said that he never actually saw a dynamite stick, but that he saw boxes that he recognized as the type used to store dynamite. Finally, he explained that he had not actually seen or handled hand grenades, but that Pitner had pointed to several boxes that Pitner claimed contained hand grenades.

Later on the same day Lauer administered another polygraph examination to Maeurer. Maeurer gave an answer indicative of deception to the following question:

Q. Did you lie when you said you saw at least one gun in Pitner's garage?

A. No.

After this examination Lauer again discussed the matter with Maeurer, but was unable to resolve the problem. Maeurer agreed to meet with Lauer again.

He did so on February 22, 1996. Lauer administered another polygraph examination to Maeurer at that time. The test concerned issues unrelated to the contents of Pitner's garage. They did not discuss Maeurer's representations concerning Pitner's garage.

The only examination at issue is the first one administered on February 20, 1996. The parties agree that the second examination on that day concerning Pitner's garage was not based on a sufficiently reliable scientific methodology to be admitted.

## B. Polygraph Examination Methodology.

Lauer used a polygraph method known as the "control question" or "zone of control" technique. In doing so he attempted to measure whether Maeurer's answers to targeted questions, which are referred to as relevant questions, were truthful or deceptive. To do this he measured Maeurer's physiological responses to the relevant questions in comparison to his physiological responses to the control questions. The theory behind this approach was that Maeurer would manifest heightened physiological responses if he made a statement that caused him to fear that he would be caught in a lie.

Lauer used a polygraph machine that had a pneumograph that recorded Maeurer's res-

piratory activity, a galvanograph that recorded electrical resistance on the surface of Maeurer's skin, and a cardiograph that recorded his blood volume and heart rate. These physical reactions were transmitted to pens that recorded the data on moving graph paper.

The examination was comprised of three phases. Lauer conducted a pretest interview, administered the test, and then conducted a post–test interview.

During the pretest interview Lauer went over a variety of topics with Maeurer in order to make him comfortable and to formulate the questions that he would ask. He asked about Maeurer's health to ensure that he was physically and mentally able to take the test. He also discussed the relevant issues that would be tested with the relevant questions, and explored some side issues to compose the control questions. Then, Lauer and Maeurer together formulated the questions to be asked.

The control questions Lauer used were indirectly related to the topic of the relevant questions, and were designed to cause Maeurer to answer "no" despite some doubt about the truthfulness of the answer. During the test Lauer asked Maeurer the following control questions:

Q. Have you ever lied to [Labor & Industries] about your injury claims?

A. No.

Q. Other than for the reasons we talked about, would anyone that knows you well say that you are dishonest or unethical?

A. No.

Lauer asked the series of relevant and control questions three times.

After administering the test Lauer reviewed the results and assigned a point score to the comparison between Maeurer's physiological responses to the relevant and control questions. Then he conducted the post–test interview, in which he confronted Maeurer with his deceptive answers to find out why he was failing the examination. After the test Lauer sent the charts from the examination to the FBI laboratory division, where a senior polygraph examiner did a quality control review. The senior examiner looked at the charts and verified the validity of Lauer's conclusions.

## II. Analysis

### A. Admission Based on Scientific Reliability.

#### 1. *Legal Standard for Admitting Polygraph Test Results.*

Following the decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the status of the admissibility of polygraph evidence has been in flux. Prior to *Daubert* the Ninth Circuit excluded polygraph evidence. *Brown v. Darcy,* 783 F.2d 1389, 1395 (9th Cir.1986). The court explained that "[g]iven the questionable reliability of polygraph evidence and the great potential for prejudice from inaccurate polygraph evidence, we conclude that unstipulated polygraph evidence is inadmissible as technical or scientific evidence under Fed.R.Evid. 702 because it does not 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Id.* (quoting Fed.R.Evid. 702).

The court went on to explain that the per se inadmissibility of polygraph evidence was also prohibited under the more traditional analysis of relevance versus prejudice under Fed.R.Evid. 401 and 403. "The questionable reliability of polygraph evidence undermines its relevance, and the potential prejudice, time consumption and confusion ... outweighs its probative value." *Id.* at 1396 n. 13.

*Daubert,* however, changed the methodology used by courts to determine the admissibility of expert scientific testimony concerning subjects such as polygraph examination results. It rejected the *Frye* test that had guided courts before. Under that test, the proponent of the introduction of scientific evidence had to show that the theory or technique had achieved general acceptance in the scientific community. *Daubert,* 509 U.S. at 585–87, 113 S.Ct. at 2793. Instead, the Court found that to determine the admissibility of scientific evidence under Fed.R.Evid. 702, courts had to determine whether the preponderance of the evidence demonstrated that the proposed expert could testify to:

(1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

*Id.* at 591–92, 113 S.Ct. at 2796. Factors to be considered include whether the scientific theory or technique at issue can be or has been tested, whether it has been subjected to peer review and publication, what its error rate is and whether there are standards that control the methodology, and the degree to which the scientific community has accepted the theory or technique. *Id.* at 591–95, 113 S.Ct. at 2796–97.

The Ninth Circuit recently addressed the impact of *Daubert* on the admissibility of polygraph evidence in *United States v. Cordoba,* 104 F.3d 225 (9th Cir.1997). The court held that *Daubert* overruled the *Brown* per se rule barring the admission of polygraph examination results, and that district courts must perform a particularized factual inquiry into the scientific validity of such evidence to determine admissibility. *Id.* at 228. In doing so, however, the court made clear that polygraph evidence remains suspect. The court explained:

> With this holding, we are not expressing new enthusiasm for admission of unstipulated polygraph evidence. The inherent problematic nature of such evidence remains. As we noted in *Brown,* polygraph evidence has grave potential for interfering with the deliberative process.

*Id.*

Several courts have held evidentiary hearings on polygraph examinations to determine whether a sufficient scientific foundation had been laid and whether the results were admissible. *See United States v. Galbreth,* 908 F.Supp. 877 (D.N.M.1995) (admitted in criminal case); *United States v. Crumby,* 895 F.Supp. 1354 (D.Ariz.1995) (admitted in criminal case); *United States v. Williams,* 95 F.3d 723 (8th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 750, 136 L.Ed.2d 687 (1997) (excluded in criminal case); *United States v. Dominguez,* 902 F.Supp. 737 (S.D.Tex.1995) (excluded in criminal case); *Meyers v. Arcudi,* 947 F.Supp. 581 (D.Conn.1996) (excluded in civil case).

### 2. *Scientific Validity of Polygraph Test Results.*

■ Defendants in the present case presented the testimony of Dr. Stanley Abrams in order to demonstrate the scientific validity of the polygraph examination administered by Lauer. Dr. Abrams has impressive credentials. He has a bachelor's degree in psychology, a masters degree in psychology, and a Ph.D. in clinical psychology. He is licensed by the Oregon State Police Association to be a polygraph examiner.

Dr. Abrams began researching polygraph science in 1970, and began regularly administering polygraph examinations in 1971. He has performed approximately 3000 polygraph examinations. He has also taught about 30 seminars, presented about 170 lectures, published forty to forty–five articles, written chapters in five books, and written three books on polygraphy. He is a member of the American Polygraph Association, the Northwest Polygraph Examiners Association, and an honorary member of the American Association of Police Polygraphers. Dr. Abrams has testified in court about polygraph examinations between one hundred and one hundred fifty times. There can be no doubt that Dr. Abrams is an extremely well qualified expert in the field of polygraphy.

Dr. Abrams presented evidence that polygraph examinations using the control question technique have been subjected to peer reviewed testing, and that the results have been published. He presented a summary of peer reviewed studies done between 1980 and 1990. These studies indicated that polygraph examination results are 80% to 100% accurate. These studies also indicated that on average 98% of the time a polygraph examination correctly identifies when a person is being deceptive.

Dr. Abrams also admitted, however, that there are significant weaknesses in the experiments that have measured the accuracy of polygraph examinations. Several of the experiments relied on by Dr. Abrams were based on laboratory research. In these ex-

periments volunteers participated in scripted, mock crimes, and then were polygraphed about their activity. Sometimes participants were offered a monetary award for beating the test. Dr. Abrams admitted that this methodology is imperfect because the examinees have little at stake. He said "there is no comparison at all with a real situation where the individual faces imprisonment, being fined, all manner of things."

Dr. Abrams also relied on the results of blind review studies. In blind review studies confessions made subsequent to polygraph examinations are used to determine ground truth. Ground truth is then compared to the prior polygraph examination result. These studies include only individuals who fail a test and then confess, and individuals who pass a test and then are cleared by another person's confession. As a result, innocent individuals who fail a test and guilty individuals who pass a test are not included within the studies. Because these incorrect determinations of deceptiveness or truthfulness are not included, there is a risk that the blind review studies overstate the accuracy of polygraph examinations. Dr. Abrams conceded that it is "certainly possible" that the rate of error in these studies is underestimated.

Based on the studies he presented Dr. Abrams testified that polygraph examinations employing the control question technique are a generally accepted technique among those who administer polygraph examinations. Upon further inquiry by the government, however, Dr. Abrams acknowledged that the relevant scientific community includes more than those persons who administer polygraph examinations. It also includes members of the psychological and psychophysiological communities. He indicated that two polls of the Society of Psychophysiologic Research showed that 66% of the membership believed that the control question technique was a "highly valuable diagnostic tool for differentiating truth and deception." He also acknowledged that experts in the Department of Justice and the Federal Bureau of Investigation do not believe that polygraph test results have reached a general level of acceptance in the relevant scientific community sufficient to be admitted at trial.

In addition, Dr. Abrams agreed that the relevant scientific community includes to a limited degree psychiatry, neuroscience and medicine. This is particularly true with regard to the relationship between physiological responses and the stress caused by the fear of getting caught telling a lie. Dr. Abrams testified that the American Medical Association has questioned the reliability of polygraph examinations.

On whole, the evidence indicates that while certain segments of the relevant scientific community believe polygraph examination results to be valid and reliable, other segments of the community have significant reservations about polygraph examinations.

Dr. Abrams also opined that Lauer "did an excellent job in a difficult situation," and that so long as Lauer's questioning was done in a "very objective manner," he had no qualms about the results that were obtained. He acknowledged that test results can be influenced by the behavior of the examiner. This is particularly significant with regard to the manner in which the questions are formulated, and the manner in which the questions are posed to the subject. To guard against the influence of these factors Dr. Abrams said that video or audio recordings of polygraph examinations should be made. Lauer did not record Maeurer's polygraph examination.

Finally, during the cross–examination of Dr. Abrams the government elicited testimony highlighting the degree to which polygraph examinations rely on a series of assumptions and calculations that are subject to influence by a number of variables. For example, apart from the underlying validity of polygraph science, in order for the Court to admit the results of Maeurer's examination, the Court would have to conclude that the following series of steps occurred without flaw: Lauer met with Maeurer and in a relatively short span of time formulated questions relevant to Maeurer's statements concerning Pitner's garage, and questions that Maeurer would feel uncomfortable or deceptive in answering; Lauer posed questions to Maeurer in a neutral and nonsugges-

tive manner; Maeurer manifested physiological responses to the questions depending on the level of stress he felt as a result of his fear of being caught in a lie; those physiological responses were similar to those that would be experienced by an average person providing similarly deceptive or truthful answers; the machine accurately recorded Maeurer's physiological responses; Lauer accurately interpreted and scored the results and reached a valid conclusion as to Maeurer's deceptiveness based on a comparison of his physiological responses to the relevant and control questions.

Due to the vagaries of human emotion and perception and the potential for mechanical failure, the Court cannot lightly conclude that each of these steps was without error and that the examination produced an accurate measurement of objective truth. Moreover, to place full trust in such a process, where an individual is strapped to a machine and dials are read to detect deception, is an affront to the dignity and complexity of a human being.

While there have been advances in this science, the problems seem to be much the same as they were a decade ago when the *Brown* court barred the admissibility of polygraph examination results. The court explained:

> Multiple variables may influence the results of a polygraph test, including the motivation of the subject, his physical and mental condition, the competence, integrity, and attitude of the operator, the wording of the relevant questions, the appropriateness of the control questions, and the interpretation of the resulting graph.

*Brown,* 783 F.2d at 1396 (quoting *United States v. Givens,* 767 F.2d 574, 585 (9th Cir.), *cert. denied,* 474 U.S. 953, 106 S.Ct. 321, 88 L.Ed.2d 304 (1985)).

Accordingly, under Fed.R.Evid. 702 the Court concludes that the expert testimony of Lauer would not be "(1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert,* 509 U.S. at 592, 113 S.Ct. at 2796. Although Dr. Abrams presented studies indicating that polygraph examinations are valid and accurate, he also admitted that those studies have

intrinsic flaws. In addition, the scientific validity of polygraph examinations has not been generally accepted in the relevant scientific community. Instead, while some camps have accepted the science, others continue to question its validity. Finally, Dr. Abrams acknowledged that polygraph examinations can be influenced by a number of variables. These variables make reliance on polygraph examination results problematic. Moreover, absent a recording of the polygraph examination, the trustworthiness of an examination such as that administered by Lauer is further diminished.

**B. Admission Based on Balancing of Relevance and Prejudice.**

◼ If the Court were to conclude that polygraph examinations were sufficiently reliable to be admitted under Fed.R.Evid. 702, the evidence would still be excluded under Fed.R.Evid. 401 and 403. Any probative value of the evidence is substantially outweighed by its prejudicial impact.

First, the probative value of the polygraph test results is relatively small in the present case. The evidence shows that Maeurer made certain representations to the FBI about the contents of Pitner's garage, changed those representations when faced with a polygraph examination, took the polygraph examination, and then changed his story again. The operative fact of the polygraph exam, when combined with Maeurer's progressive dissembling, raise serious questions about his credibility. The addition of the examination results adds little to the strength of the evidence of untruthfulness.

Second, there is a great potential for the examination results to cause undue prejudice, confusion, and delay. When scientific evidence is presented to jurors with representations that the results are, for example, 98% accurate, there is a substantial risk that the jurors will substitute the examination results for their own judgment. Such representations detract from a close examination of the particular test, the particular circumstances and the particular witness' demeanor, and encourage an evaluation that the odds favor a finding that the examination proves decep-

tion. Moreover, the only way to dispel the danger of prejudice would be to allow the parties a complete opportunity to examine the scientific bases of the polygraph technique. The *Daubert* hearing on this subject took most of a day. The consumption of that much time to evaluate one statement by an informant would likely confuse the jury as to the importance of the issue and would unduly delay trial.

Finally, as the court said in *Brown*, polygraph examination evidence invades the province of the jury to make credibility determinations.

> The introduction of polygraph evidence also infringes on the jury's role in determining credibility. Our adversary system is built on the premise that the jury reviews the testimony and determines which version of events it believes. Allowing a polygraph expert to analyze responses to a series of questions and then testify that one side is telling the truth interferes with this function.

*Brown*, 783 F.2d at 1396. Indeed, if this were an appropriate method for aiding a jury in its credibility determinations, every witness could be subject to a review of credibility by an expert. As Lauer testified in the *Daubert* hearing, he believes that in seventeen years of law enforcement he has learned to recognize verbal and nonverbal deception indicators. A bowed head, a sweaty brow, averted eyes, stuttered speech; these could all be indicators of deception that an expert could evaluate to aid a jury's consideration of credibility. Such an approach would, however, improperly interfere with and confuse a jury's credibility determinations.

### C. Admission as Extrinsic Evidence Regarding Credibility.

█ The polygraph results are also inadmissible under Fed.R.Evid. 608(b) as extrinsic impeachment evidence. This rule "prohibits a party from introducing extrinsic evidence 'solely for the purpose of attacking the credibility of a witness.'" *United States v. Sanchez–Robles*, 927 F.2d 1070, 1078 (9th Cir.1991) (quoting *United States v. Bosley*, 615 F.2d 1274, 1276 (9th Cir.1980)). The Rule says that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence." A polygraph examination result is purported to be a measure of a specific instance of dishonesty. As such it is inadmissible extrinsic evidence. It is also not evidence of a person's reputation for truthfulness, which could be admissible under Fed.R.Evid. 608(a). Dr. Abrams was clear in stating that no such conclusion could be gleaned from a polygraph examination.

### D. Admission of Operative Fact of Polygraph Examination.

█ The fact that Maeurer underwent a polygraph examination may be admitted so long as the results of the examination are not disclosed. Polygraph evidence may be admitted as an operative fact if it "is being introduced because it is relevant that a polygraph examination was given, regardless of the result." *United States v. Bowen*, 857 F.2d 1337, 1341 (9th Cir.1988) (affirming exclusion of polygraph exam as operative fact). Even if the fact of the exam is relevant, it may still be excluded as overly prejudicial under Fed.R.Evid. 403. That occurred in *Bowen*, where the court concluded that if the facts about an exam were admitted without the results the jury would still be reasonably likely to infer that the defendant "did indeed fail the polygraph examination." *Id.*

Here, the statements made by Maeurer, when disclosed with information as to when he was told he would take an exam and when he did take an exam, would be relevant even if the exam results were not disclosed. First, the fact that Maeurer changed his story when told he would be taking a polygraph examination suggest that the fear of getting caught in a lie was enough for him to change his account of the contents of Pitner's garage. Second, absent evidence of the examination the jurors could be left with the misconception that Maeurer came forward to clarify his representations without prompting from another source. However, the same concern as in *Bowen* is present here because the jurors could infer that Maeurer failed the

polygraph examination if they were told that he modified his story after the test. Unlike *Bowen*, however, Maeurer is not a defendant, and the impact of such an inference will not prejudice the ultimate question of his guilt or innocence. *See id.* To the contrary, the absence of the operative fact of the polygraph examination could weaken defendants' attack on the government's primary witness. Under these circumstances, the Court concludes that the probative value of the operative fact of the polygraph examination outweighs the potential prejudice.

### III.  Conclusion

The government's motion to exclude the evidence of the polygraph examination is PARTIALLY GRANTED pursuant to the terms of this Order. The operative fact of the polygraph examination may be admitted, but the results of the polygraph examination may not be admitted.