789 So.2d 752 (2001)
Johnny M. EVANS, Sr.
v.
DeRIDDER MUNICIPAL FIRE & POLICE CIVIL SERVICE BOARD.
No. 01-118.
Court of Appeal of Louisiana, Third Circuit.
June 27, 2001.
Rehearing Denied August 8, 2001.
*754 David Ramsey Lestage, Hall, Lestage & Landreneau, DeRidder, LA, Counsel for Defendant/Appellee DeRidder Municipal Fire & Police Civil Service Board.
Charles A. "Sam" Jones, III, Attorney at Law, DeRidder, LA, Counsel for Plaintiff/Appellant Johnny M. Evans, Sr.
Court composed of SYLVIA R. COOKS, BILLIE COLOMBARO WOODARD, and JIMMIE C. PETERS, Judges.
WOODARD, Judge.
The Mayor of the City of DeRidder, Louisiana, terminated Patrolman Johnny M. Evans, Sr., from the police force on October 31, 1997. Patrolman Evans appealed to the DeRidder Municipal Fire and Police Civil Service Board (the Board), which upheld the Mayor's decision. Then, he appealed to the Thirty Sixth Judicial District Court, which upheld the Board. He files the instant appeal, maintaining that the polygraph examination results should not have been admitted into evidence and that they substantially influenced the Board's decision.
We find that the trial court erred in upholding the Board's decision to admit the evidence. Accordingly, we reverse and restore Patrolman Evans to his position with back pay and allowances.

* * * * *
On August 25, 1997, Mr. Johnny M. Evans, Jr. (Johnny), Patrolman Evans, Sr.'s son, and Mr. Eric Pickens killed Mr. Earnest Prater, Jr. Apparently, the killing occurred because the decedent had given the police department information which *755 had led to Mr. Pickens' arrest for a drug-related offense.
Prior to finding Mr. Prater's killers, Mr. Pickens indicated to DeRidder law enforcement, on August 28, 1997, that he might have information about a motive in the murder. He told Sergeant John Gott, Lieutenant Ricky Johnson, and Sergeant Kenny Pine that, when he was at Patrolman Evans' home the previous week, Patrolman Evans told him that Mr. Prater worked for the police and had "busted" Mr. Pickens and another person.
During DeRidder Chief of Police, Arvin Malone's, investigation of this claim, he asked Patrolman Evans to take a polygraph test, which Patrolman Evans initially refused. Ultimately, Chief Malone ordered him to comply or to be terminated. After Patrolman Evans took the test, the polygrapher opined that he had not told the entire truth on all of the pertinent questions; i.e., those related to whether he had divulged confidential information to unauthorized people. Upon receiving the polygrapher's report, Chief Malone recommended Patrolman Evans' dismissal, effective October 31, 1997. Mayor Gerald Johnson approved the recommendation.
Patrolman Evans appealed to the Board. After a hearing on December 18, 1997, substantially relying on the polygrapher's testimony, the Board unanimously found that the alleged violation had occurred and that the appointing authority (the Mayor) had acted in good faith and for cause. Patrolman Evans appealed to the Thirty Sixth Judicial District Court, which affirmed the Board's decision on October 9, 2000. He files the instant appeal, seeking his reinstatement and claiming that the trial court erred when upholding the Board's decision to admit the polygrapher's expert opinion into evidence.

* * * * *

DISMISSAL OF CIVIL SERVANTS
An employee, who has gained permanent status in the classified city civil service, cannot be subjected to his employer's disciplinary action, including dismissal, except for cause.[1] When determining "cause" for discharge, the Louisiana Supreme Court, in Walters v. Department of Police of the City of New Orleans,[2] set forth "`[c]ause' for the dismissal of a person who has gained permanent status in the classified civil service has been interpreted to include conduct prejudicial to the public service in which the employee in question is engaged or detrimental to its efficient operation." In Bannister v. Department of Streets,[3] the supreme court further elaborated on its Walters' requirements, holding that "disciplinary action against a civil service employee will be deemed arbitrary and capricious unless there is a real and substantial relationship between the improper conduct and the `efficient operation' of the public service."
A dismissal of a civil servant "for cause" is synonymous with legal cause.[4] Namely, "[l]egal cause for disciplinary action exists if the facts found by the commission disclose that the conduct of the employee impairs the efficiency of the public service."[5] La.R.S. 33:2561 allows a *756 public employee to apply to the Board for review of a discharge or disciplinary action. This statute limits the Board to "the question of whether the action taken against the employee was made in good faith for cause."
The burden of proving legal cause is on the appointing authority-in this case, the Mayor of DeRidder, Louisiana.[6] Thus, the Mayor must demonstrate, by a preponderance of the evidence, that the conduct did, in fact, impair the public service's efficiency and orderly operation. It is the Board's duty to decide whether the appointing authority had good or lawful cause for taking disciplinary action and, if so, whether the punishment imposed was commensurate with the dereliction. The Board has an obligation to uphold the Mayor's disciplinary action if it finds sufficient cause.[7]
La.R.S. 33:2561(E) further provides that the employee may appeal the Board's decision and that the court shall hear and determine the appeal in a summary manner. Similar to the requirements imposed upon the Board, La.R.S. 33:2561(E) mandates that the district court's review be "confined to the determination of whether the decision made by the board was made in good faith for cause[.]" On appeal, when reviewing the Board's findings of fact, we must apply the manifest error standard to factual findings and then consider whether the action of the court is arbitrary, capricious, or an abuse of discretion.[8]
The Mayor has the burden of proving his case by a "preponderance of the evidence." The Board's findings must be based on competent evidence, as appellate courts will not consider incompetent evidence on review.[9] Although, we must find the facts to have been clearly established, they need not have been proven beyond a "reasonable doubt," as in a criminal case.
It is beyond question that if Patrolman Evans revealed the name of a confidential informant to those unauthorized to possess such information, sufficient legal cause would exist to terminate his employment. However, we must decide whether the Board's evidence was competent and sufficient. Specifically, among other evidentiary issues, we must determine, apparently for the first time in our circuit, whether polygraph examination results are admissible in civil proceedings.
The crux of the Mayor's case consisted of the polygrapher's report and testimony. Mr. Calvin Trahan administered the test, interpreted the results, and, originally, sent his report to Chief Malone. After receiving it, Chief Malone terminated Patrolman Evans. In turn, the Board considered the report, during the termination hearing, over Patrolman Evans' counsel's vigorous challenge. The trial court upheld the Board's admission, finding that the exclusion of polygraph evidence in criminal trials did not, per se, require its exclusion in other proceedings.

PRELIMINARY CONSIDERATIONS ON POLYGRAPH
Although the trial court misapplied Catanese[10] in support of its admission of the evidence, it correctly recognized that polygraph results, generally, are inadmissible *757 in criminal trials.[11] This hard line is understandable, as there, simply, is no consensus that polygraph evidence is reliable.[12] In fact, the scientific community remains extremely polarized about polygraph techniques' reliability.
Furthermore, assuming that "the basic debate about the reliability of polygraph technology itself were resolved, however, there would still be controversy over the efficacy of countermeasures, or deliberately adopted strategies that a polygraph examinee can employ to provoke physiological responses that will obscure accurate readings and thus `fool' the polygraph machine and the examiner."[13]
The machine "simultaneously and continuously measures and records ... physiological reactions on a graph or chart (polygram). Respiration is measured by pneumatic tubes attached to the subject's chest and abdomen; cardiovascular activity is measured by a blood pressure cuff (Sphygmomanometer) strapped around his upper arm or wrist and forearm; and perspiration (galvanic skin response) is measured by electrodes that are attached to the subject's fingertips."[14]
While the machine appears to produce straightforward and reliable physiological measurements, the examiner's method of questioning, as well as his or her interpretation of the results, may not. Therein lies an acute danger. "[T]he individual skill and training of examiners ... affects the reliability of a polygraph. Clearly, `bells do not go off' at the moment someone tells a lie. Rather, the polygraph's ability to discern the truth rests in the skill of examiners. `Although an adequate instrument is essential for proper testing, the role of the examiner in interviewing the examinee, designing test questions, and evaluating and interpreting the polygram is much more critical to an accurate diagnosis than is the mechanical function of the polygraph itself.' Thus, the skill of examiners fundamentally affects the ultimate reliability of the test."[15]
However, one of the main reasons which bolsters polygraphs' prohibition in legal proceedings involves, not only the issue concerning its reliability but, also, its probative value or relevancy. Apparently, there is no scientifically proven cause and effect connection between an increase in the pertinent physiological reactions and "truth telling." Indeed, some authors noted that "[t]he heart of the present critique of the polygraph is that no theory that ties deception (or any criminal activity) with physiological reactions has been formulated. Furthermore, there is `no known physiological response that is unique to deception,' and all physiological measures used for polygraph tests are sensitive to, and can be elicited by, a host of factors other than deception or criminal activity. If deception is not uniquely related to physiological reactions, and theory cannot explain the nature of the relationship, it is impossible to predict the conditions under which polygraph test results will be accurate or inaccurate."[16]
*758 Until now in Louisiana courts, "the foremost reason for disallowing such evidence rests with its exaggerated, prejudicial effect upon the triers of fact.[17]"[18] This is motivated by the experience that "`present-day jurors, despite their sophistication and increased education levels and intellectual capabilities, are still likely to give significant, if not conclusive, weight' to such evidence,[19]"[20] which is obviously what happened in the case sub judice.
Generally, trial judges have a gatekeeping function and vast discretion when determining whether to admit expert testimony.[21] However, the expert's opinion must be based upon correct assumptions of facts and supported by the record.[22] Additionally, the expert's testimony must be both reliable and relevant.[23] "[A]n expert is one who, usually by education or experience, has a unique knowledge of the subject matter at issue[.]"[24] It is appropriate to admit reliable, relevant expert testimony when the expert has specialized knowledge to assist the trier of fact in its fact-finding function.[25]
The polygraph has been coined as a "lie-detector." In other words, its very purpose serves to determine whether a person is telling the truth. In our legal system, this function is precisely within the trier of fact's role. In fact, we call upon fact finders to use their personal life experience, common knowledge, and intuition to determine credibilitywhether a litigant or witness is telling the truth. Impliedly, we treat our fact finders as "experts" in the truth telling arena and give the utmost respect to their ultimate findings. This respect, conferred upon the trier of fact, further permeates our entire legal system. Indeed, courts of appeal are constrained not to overturn a fact finder's credibility determination, absent finding that it committed a manifest error. For example, in Darbonne v. Wal-Mart Stores Inc.,[26] we summarized the manifest error rule as follows:
The reviewing court must give great weight to the factual conclusions of the trial court. Manifest error is the standard used by appellate courts to resolve conflicting factual evidence. This means that where a reasonable factual basis exists for those findings, they should not *759 be disturbed by the appellate court in the absence of manifest error. A court of appeal may set aside a trial court's or a jury's finding of fact if it finds that there was manifest error or if the decision was clearly wrong. If the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even if it is convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.
For the reviewing court, the issue to be resolved is not whether the trier of fact was wrong but whether the factfinder's conclusions were reasonable. Thus, where there is a conflict in the testimony, the trial court's reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review even if the appellate court may feel that its own evaluations and inferences are as reasonable.
(Emphasis added.)
Obviously, determining "the truth" is sacred ground which we have, traditionally, reserved for the fact finder. Allowing an "an expert" in "lie-detecting" to testify as to whether a witness is telling the truth imports the danger to supplant, rather than assist, the fact finder in its major function. Indeed, permitting this to take place promises that a litigant will use such an "expert," in rebuttal, to verify the credibility of his/her witnesses attacked, as well as to assail the opponent's case by providing "expert" testimony that the opponents' witnesses are "lying."

ADMISSIBILITY OF POLYGRAPH EVIDENCE
From a purely evidentiary standpoint, we find polygraph evidence to be inadmissible. Essentially, polygraph testimony amounts to credibility determinations, impliedly based on character for truthfulness. Our code of evidence, as do the Federal Rules of Evidence, provides that character evidence is generally inadmissible to show that the person acted accordingly.[27]
Louisiana Code of Evidence Article 404(A)(3) describes an exception to this general rule, concerning a witness' character, under La.Code Evid. arts. 607, 608 and 609. Article 609, which imparts an exception to attacking credibility by admitting evidence of criminal conviction in civil cases, does not apply to the circumstances sub judice. However, Article 607(A) sets forth general rules to attack and support credibility. First, it states that "[t]he credibility of a witness may be attacked by any party, including the party calling him." However, it distinguishes intrinsic and extrinsic evidence when providing guidelines for admissibility.
Intrinsic evidence is generally admissible to attack the credibility of a witness. Article 607(C) states that "a party ... may examine [the witness] concerning any matter having a reasonable tendency to disprove the truthfulness or accuracy of his testimony."
Regarding extrinsic evidence admissibility, Article 607(D) provides:
Except as otherwise provided by legislation:
(1) Extrinsic evidence to show a witness' bias, interest, corruption, or defect of capacity is admissible to attack the credibility of the witness.
(2) Other extrinsic evidence, including prior inconsistent statements and evidence contradicting the witness' testimony, is admissible when offered solely to attack the credibility of a witness unless the court determines that the probative value of the evidence on the issue of *760 credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice.
Article 608 specifies distinctive factual circumstances and modalities to admit extrinsic evidence. For example, La.Code Evid. art. 608(A) provides for the admissibility of "[r]eputation evidence of character"; Article 608(B) for "[p]articular acts, vices or courses of conduct"; and Article 608(C) for "[c]ross-examination of character witnesses." Particularly relevant to the case sub judice, La.Code Evid. art. 608(A) states that "[t]he credibility of a witness may be attacked or supported by evidence in the form of general reputation only [.]" (Emphasis added.) Further, concerning specific instances of conduct, La.Code Evid. art. 608(B) provides that "[p]articular acts, vices, or courses of conduct of a witness may not be inquired into or proved by extrinsic evidence for the purpose of attacking his character for truthfulness, other than conviction of crime as provided in Articles 609 and 609.1 or as constitutionally required." (Emphasis added.)
In the case sub judice, the Mayor introduced the polygraph test's results and the polygraph expert's testimony, both extrinsic evidence by definition, to directly attack Patrolman Evans's credibility; namely, to prove that he lied when he said that he did not divulge Mr. Prater's identity as an informant to any unauthorized person; i.e., his son and/or Mr. Pickens. The demarcations, which the polygraph machine made, per se, are meaningless. And, essentially, Mr. Trahan's interpretation of them, along with his concomitant testimony, amount to an attack on Patrolman Evans' credibility, based on particular actshis responses to Mr. Trahan's questions.
Accordingly, we find Mr. Trahan's testimony and the test results to be inadmissible under La.Code Evid. art. 608(A) and (B), as neither, the testimony nor the results, constitutes "[r]eputation evidence of character." Specifically, Mr. Trahan's opinion, grounded in his interpretation of Patrolman Evans' physiological and verbal responses to his questions, is not an opinion regarding Patrolman Evan's character for truthfulness or untruthfulness based on his reputation in the community.
Indeed, even if a link could be established between physiological responses and deceit, ascertaining a person's truthfulness on a specific occasion and in the form of a few questions is not tantamount to addressing one's character or reputation for truthfulness. Indeed, in United States v. Scheffer,[28] the United States Supreme Court stated that "an expert polygrapher's interpretation of polygraph results ... is merely the opinion of a witness with no knowledge about any of the [relevant] facts... concerning whether the [witness] spoke truthfully or deceptively on another occasion." Furthermore, assuming that the polygrapher had wished to testify as to Patrolman Evan's character or reputation for truthfulness, rather than give his interpretation of the polygraph results and of Patrolman Evans' specific answers to some of his questions, he would not have been qualified to do so, as he failed to demonstrate a personal knowledge in that regard.
Accordingly, the trial court erred when it upheld the Board's decision to admit the Mr. Trahan's testimony and polygraph results.
Although our determination on this issue appears to be res nova in Louisiana, there *761 is support for it in Federal Court's decisions.[29]

DE NOVO REVIEW
Having found a legal error in the Board's and trial court's decisions to admit the polygraph results and the polygrapher's testimony into evidence, we conduct a de novo review of the record's remaining evidence to determine whether it sufficiently supports the Board's findings and action.
Excluding the polygraph-related evidence, the Mayor's case consists of Patrolman Evans' sworn testimony, denying that he had revealed Mr. Prater's name to anyone who was unauthorizedJohnny or Mr. Pickenscontradicted by an unsworn statement, transcribed from what Mr. Pickens purportedly related to law enforcement.
Patrolman Evans' counsel objected to the statement's admissibility. We are mindful of the fact that Mr. Pickens opted to "take the fifth" at Patrolman Evans' board hearing, as opposed to testifying, thus making him technically unavailable under La.Code Evid. art. 804(A). It is well settled that when a declarant is unavailable under La.Code Evid. art. 804(A), her/his hearsay statement, nevertheless, may be admitted into evidence if it fits within one of the six hearsay exceptions designated under La.Code Evid. art. 804(B).
At first glance, only two of those exceptions could prove applicable to Mr. Pickens' statement. First, La.Code Evid. art. (804)(B)(3) provides an exception to the hearsay rule in the case of a "[s]tatement against interest." However, we do not find this exception applicable, because although Mr. Pickens' statement, as a whole, may have been against his penal interest, to some extent, under Williamson v. United States,[30] as adopted in Louisiana by State v. Smith,[31] and State v. Anthony,[32] the part of his statement involving Patrolman Evans was not self-inculpatory. Thus, it was inadmissible.
Second, La.Code Evid. art. (804)(B)(6), a catchall provision, provides in relevant part, that a hearsay statement may be admissible when "[i]n a civil case, a statement not specifically covered by any of the foregoing exceptions if the court determines that considering all pertinent circumstances in the particular case the statement is trustworthy[.]" We note two crucial contradictions in Mr. Pickens' statement concerning Patrolman Evans having divulged a confidential informant. Mr. Pickens stated that Johnny did not mention names. Instead, "He [Johnny] said some niggers on Bishop told me that Ernie [Prater] was the one ratting us out." Not only does this underscore a critical inconsistency, but it also demonstrates that there could have been another source for his information other than Patrolman Evans.
Additionally, Mr. Pickens discredited himself concerning the circumstances under which Patrolman Evans imparted the information. In one instance, he claimed that upon arriving at their house, he heard *762 Patrolman Evans talking to his son about Mr. Prater's identity. Yet, another time, he said that Johnny was not present when Patrolman Evans gave Mr. Pickens the information.
Accordingly, we find that Mr. Pickens' purported accounts are so inconsistent on core issues regarding Patrolman Evans' alleged violation that they lack total credibility and trustworthiness. Thus, his statement should not have been admitted under La.Code Evid. 804(B)(6), and the trial court erred when it denied Patrolman Evans' objection to that effect.
This leaves us with Patrolman Evans' testimony and Chief Malone's conjecture. The gist of Chief Malone's theory dealt with his belief that Patrolman Evans revealed the information in order to protect his son from arrest for drug usage and because Mr. Pickens was a friend. However, Patrolman Evans' history of behavior does not support Chief Malone's theory. Quite the contrary. The record reveals that Patrolman Evans has never tried to shield Johnny or any family member from criminal prosecution and, in fact, has been completely forthright and aggressive by taking immediate potentially punitive action in that regard. For example, he initiated an investigation of his son, which could have caused his arrest. Specifically, when he suspected him of drug dealing, he contacted the police and asked them to investigate. He also helped them to search his car and told his fellow officers that "if they had to put him (Johnny) in jail ... they had a job to do. But I did not want him on the street selling drugs." He remarked that he would have assisted them in arresting his son, if needed.
In another incident, he suspected a nephew, who was living with him at the time, of being involved with drugs. He contacted Sergeant Pine, who was in charge of the DeRidder Police Department, and summoned a drug detecting dog unit to search his house. The search yielded crack cocaine.
Betty Rose Pichon, Deputy Sheriff with the Beauregard Parish Sheriff's Office, fundamentally and unequivocally confirmed Patrolman Evans' testimony regarding both incidents.
If anything, his exemplary behavioral history speaks just the opposite of a man who would do anything to protect his son from a drug arrest.
Based on this record, we conclude that the Board did not possess sufficient "cause" to terminate him. Accordingly, we restore him to his former position with back pay and allowances.

CONCLUSION
The district court erred in affirming the Board's decision to uphold Patrolman Evans' termination. We reverse, holding that the Board abused its discretion in admitting the polygraph examination results and Mr. Trahan's testimony. We restore Patrolman Evans to his former position, with back pay and allowances, and cast the City, to the extent allowed by law, with costs, in the amount of $734.25.
REVERSED.
NOTES
[1] La. Const. art. X, § 8(A).
[2] 454 So.2d 106, 113 (La.1984).
[3] 95-404, p. 8, (La.1/16/96); 666 So.2d 641, 647.
[4] Appointing Authority, Chief of Police for the City of Kenner v. Trippi, 499 So.2d 1177 (La. App. 5 Cir.1986); City of Westwego v. McKee, 448 So.2d 166 (La.App. 5 Cir.1984), writ denied, 503 So.2d 22 (La.1987).
[5] Appointing Authority, Chief of Police for the City of Kenner, 499 So.2d at 1180 (citing Leggett v. Northwestern State College, 242 La. 927, 938, 140 So.2d 5, 9 (1962)). See also, Ruddock v. Jefferson Parish Fire Civil Serv. Bd., 96-831, p. 2 (La.App. 5 Cir. 1/28/97); 688 So.2d 112, 114.
[6] Id.
[7] Id.
[8] Walters, 454 So.2d 106.
[9] George v. Department of Fire, 93-2421 (La. App. 4 Cir. 5/17/94); 637 So.2d 1097.
[10] State v. Catanese, 368 So.2d 975 (La.1979).
[11] Id.
[12] U.S. v. Scheffer, 523 U.S. 303, 118 S.Ct. 1261, 140 L.Ed.2d 413(1998).
[13] Id. at 1265 n. 6.
[14] Lisa A. Bonsignore, The Employee Polygraph Protection Act of 1988: Assessing the Validity of Banning Pre Employment Screening of Job Applications, 6 J. SUFFOLK ACAD. L., 159 fn. 10 (1989).
[15] Yvonne Koontz Sening, Heads or Tails: The Employee Polygraph Protection Act, 39 CATH.U.L.REV. 235, 264 (1989) (footnotes omitted).
[16] Leonard Saxe and Gershon Ben-Shakhar, Admissibility of Polygraph Tests the Application of Scientific Standards Post-Daubert, 5 PSYCHOL. PUB. POL'Y & L 203, 219 (1999) (citation omitted) (emphasis added).
[17] (Citing in accord, E. Cleary, MCCORMICK'S HANDBOOK ON THE LAW OF EVIDENCE, § 207 at 507 (2d. 1972)).
[18] Hines v. Arkansas La. Gas Co., 613 So.2d 646, 650 (La.App. 2 Cir.1993), writ denied, 617 So.2d 932 (La.1993).
[19] (Citing U.S. v. Alexander, 526 F.2d 161, 168 (8th Cir.1975)).
[20] Hines 613 So.2d at 650.
[21] See Tullis v. Rapides Parish Police Jury, 95-905 (La.App. 3 Cir. 1/17/96); 670 So.2d 245, writ not considered, 96-444 (La.3/29/96); 670 So.2d 1241.
[22] Id.
[23] Sandell v. Hooter, 96-1062 (La.App. 3 Cir. 2/26/97); 692 So.2d 474, writ denied, 97-801 (La.5/1/97); 693 So.2d 730.
[24] Barrett v. T. L. James & Co., 28,170, p. 12 (La.App. 2 Cir. 4/3/96); 671 So.2d 1186, 1194, writ denied, 96-1124 (La.6/7/96); 674 So.2d 973 (emphasis added).
[25] La.Code Evid. art. 702, see State v. Bosworth, 593 So.2d 1356, 1360 (La.App. 4 Cir.), writ denied, 600 So.2d 658 (La.1992).
[26] 00-551, pp. 3-4 (La.App. 3 Cir. 11/2/00); 774 So.2d 1022, 1025-26 (citations omitted).
[27] La.Code Evid. art. 404.
[28] 523 U.S. at 317, 118 S.Ct. at 1268, n. 13 (1998).
[29] Maddox v. Cash Loans of Huntsville II, 21 F.Supp.2d 1336 (N.D.Ala.1998); see United States v. Sanchez-Robles, 927 F.2d 1070 (9th Cir.1991); see also, Scheffer, 523 U.S. 303, 118 S.Ct. 1261, 140 L.Ed.2d 413; United States v. Pitner, 969 F.Supp. 1246 (W.D.Wash. 1997).
[30] 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994).
[31] 94-1221, 94-1222, 94-1223 (La.10/7/94); 643 So.2d 1221.
[32] 97-91 (La.App. 3 Cir. 6/4/97); 695 So.2d 1142, writ denied, 97-1774 (La.11/26/97); 703 So.2d 645.